# EXHIBIT D

LEXSEE 2006 US DIST LEXIS 80148



Positive
As of: Jul 30, 2008

**DENT-A-MED, INC., d/b/a HC PROCESSING CENTER, Plaintiff, v. LIFETIME SMILES, P.C., formerly known as WHITE OAK DENTAL, P.C., an Illinois corporation; DW MANAGEMENT COMPANY, formerly known as LIFETIME SMILES, INC., an Illinois corporation; FRED S. WEINER, DAISY WEINER, JOY A. TEXTER, and SUSAN YANOWSKY, Defendants.**

**Case No 04 C 4780**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 80148*

**November 1, 2006, Decided
November 1, 2006, Filed**

**COUNSEL:** [*1] For Dent-A-Med Inc, Plaintiff: Richard J. Arendt, Law Office of Richard J. Arendt, Chicago, IL.

For Liftime Smiles PC, an Illinois corporation, DW Management Company, an Illinois corporation, Daisy Weiner, Susan Yanowsky, Defendants: Rod Radjenovich, Jeffrey Strange, Jeffrey Strange & Associates, Wilmette, IL.

For Joy A Texter, Defendant, Pro se, Oak Forest, IL.

**JUDGES:** Harry D. Leinenweber, Judge.

**OPINION BY:** Harry D. Leinenweber

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Dent-A-Med, Inc., d/b/a HC Processing Center (hereinafter, "Dent-A-Med") brings this suit alleging common law fraud, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, breach of contract, and conversion against Lifetime Smiles, P.O., DW Management Company (hereinafter, "DW Management"), Fred S. Weiner, Daisy Weiner (hereinafter, "Ms. Weiner"), Joy A. Texter (hereinafter, "Ms. Texter"), and Susan Yanowsky (hereinafter, "Ms.

Yanowsky"). Before this Court is Ms. Weiner, Ms. Yanowsky, and DW Management's Motion for Summary Judgment on the common law fraud and Illinois Consumer Fraud counts. For the reasons stated herein, this motion is granted in part and denied in part.

**I.** [*2] **BACKGROUND**

Dent-A-Med provides financing to patients undergoing dental procedures. In December 2002, Dent-A-Med and Fred S. Weiner's dental practice, White Oak Dental, purporting to do business as Lifetime Smiles (hereinafter, "the dental practice"), entered into an agreement by which Dent-A-Med would provide financing to the dental practice's patients. According to the Provider Agreement, the dental practice would accept Dent-A-Med's credit card as payment for dental services and would submit a charge slip to Dent-A-Med for each credit card sale.

Dent-A-Med alleges that between December 2002 and December 2003, the dental practice submitted charge slips for dental work that had not yet been performed, was performed in a substandard manner, and/or was never performed. Dent-A-Med alleges that it relied on these charge slips and paid funds to the dental practice as a result. The parties dispute these allegations as well as whether Dent-A-Med had a policy that charges were to be submitted only for services already provided and

whether Dent-A-Med was aware at all times that charge slips were being submitted for uncompleted work.

Copies of the disputed slips were provided by Dent-A-Med [*3] with its complaint; most bear the signature of Ms. Texter, the dental practice's office manager. Those slips that do not bear Ms. Texter's signature apparently do not require a signature by an employee of the dental practice and have not been signed. Charge slips were most often submitted by Ms. Texter. However, the parties agree that during at least one week while Ms. Texter was on vacation, Ms. Yanowsky signed and submitted charge slips. Neither party specifies when this vacation occurred and this Court's perusal of the record provides no enlightenment. Ms. Texter herself admits that she submitted most of the charge slips at issue, but denies submitting three unsigned slips. Ms. Texter speculates that Ms. Yanowsky "could have" submitted them, but Ms. Yanowsky denies submitting them. Ms. Weiner (the dental practice's bookkeeper) did not prepare, submit, or sign any charge slips; however, she had some telephone conversations with Dent-A-Med employees regarding previously submitted charge slips.

## II. LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show [*4] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it could affect the suit's outcome under governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The court must view all the evidence and any reasonable inferences therefrom in the light most favorable to the non-moving party. See Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1003 (7th Cir. 2000).

## III. DISCUSSION

### A. Dent-A-Med's Challenge to the Affidavits

Dent-A-Med challenges Defendants' reliance on the affidavits provided by Ms. Weiner and Ms. Yanowsky as a basis for some of Defendants' factual statements. A court will discount or disregard an affidavit that is in conflict with a party's deposition testimony. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806-07, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999); Velez v. City of Chicago, 442 F.3d 1043, 1049 (7th Cir. 2006); [*5] Barner v. City of Harvey, 1998 U.S. Dist. LEXIS 14937, 1998 WL 664951 at *2 (N.D. Ill. Sept. 18, 1998). Although this rule is applied more often in the movant's

favor, courts have invoked it in cases where a movant has offered a contradictory affidavit as a basis for factual statements included in a 56.1(a) statement. See Barner, 1998 U.S. Dist. LEXIS 14937, 1998 WL 664951 at *2; Morgan v. Ponderosa, Inc., 1998 WL 325213 (N.D. Ill. June 9, 1998). Where the two statements, however, are inconsistent because the deposition statement was mistaken, "perhaps because the question was phrased in a confusing manner or because a lapse of memory is . . . a plausible explanation for the discrepancy," a court will not disregard the affidavit. Velez, 442 F.3d at 1049. Thus, this Court will disregard any statements in the affidavits that contradict Ms. Weiner's and Ms. Yanowsky's depositions.

Dent-A-Med points to a series of "contradictory" statements in Ms. Weiner's affidavit. First, Dent-A-Med argues that Ms. Weiner's statements ("I do all of the accounting") in transcripts of telephone conversations admitted in her affidavit conflict with her deposition (I "assisted my husband . . [*6] . with his bookkeeping") and should be ignored. These two statements mean essentially the same thing. Second, Dent-A-Med argues that Ms. Weiner's affidavit is "internally inconsistent" because she claims both that she never made any representations to Dent-A-Med and that she had telephone conversations with Dent-A-Med (during which Dent-A-Med claims Ms. Weiner made representations). Dent-A-Med's argument is beside the point; it does not claim a discrepancy between Ms. Weiner's affidavit and her deposition. Dent-A-Med also argues that Ms. Weiner's statement that she never submitted any charge slips to Dent-A-Med conflicts with Dent-A-Med's complaint alleging that Ms. Weiner was an alter ego of Lifetime Smiles, Inc., and the fact that answers to interrogatories admit that charge slips were submitted by Fred Weiner. The fact that Ms. Weiner's affidavit conflicts with the alter ego allegations in Dent-A-Med's complaint is not a proper ground for striking an affidavit. Lastly, Dent-A-Med argues that the transcripts admitted in the affidavit include conversations with Dent-A-Med employees, the content of which Daisy Weiner claimed not to recall in her deposition. Courts consistently do not [*7] find affidavits contradictory where a lapse of memory during the deposition causes the supposed "contradiction." See, e.g., Velez, 442 F.3d at 1049.

Next, Dent-A-Med argues that Ms. Yanowsky's affidavit should be disregarded because it contradicts her deposition. In her deposition, Ms. Yanowsky stated that she performed Ms. Texter's job while Ms. Texter was on vacation, including the submission of charge slips to Dent-A-Med. In her affidavit, Ms. Yanowsky stated that she did not submit the charge slips attached to Dent-A-Med's complaint and did not assist in their preparation. These statements are not contradictory; Ms. Yanowsky

may very well have prepared charge slips and submitted them to Dent-A-Med during Ms. Texter's vacation and still not have submitted any of the charge slips attached to Dent-A-Med's complaint. Because the affidavit does not contradict the deposition, this court will not disregard it.

## B. Shauna Barnes' Deposition

Dent-A-Med also challenges Defendants' characterization of the deposition of Shauna Barnes (hereinafter, "Ms. Barnes") as a *Rule 30(b)(6)* deposition of a corporation. *Rule 30(b)(6)* permits the deposition of an organization [*8] to be taken if a party notices a deposition of the organization and "describe[s] with reasonable particularity the matters on which examination is requested." The organization must then "designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf." *FED. R. CIV. P. 30(b)(6)*. Defendants did not properly notice a *30(b)(6)* deposition. Defendants' notice names Ms. Barnes as the person or entity to be deposed, fails to specify the matters on which examination is sought, and gives no indication that Ms. Barnes is expected to testify on behalf of Dent-A-Med. *Operative Plasterers' & Cement Masons' Intl. Assoc. of the United States & Canada ALF-CIO v. Benjamin, 144 F.R.D. 87, 90 (N.D. Ind. 1992)*. Furthermore, Defendants' notice does not allow Dent-A-Med to designate a knowledgeable person to testify on its behalf. *See id.* Defendants argue that Ms. Barnes deposition was identified as a *30(b)* deposition, and that Dent-A-Med did not object. The deposition was identified as a *Rule 30(b)* deposition, but *not* a *Rule 30(b)(6)* deposition (there are several types of *Rule 30(b)* depositions). [*9] Dent-A-Med is correct that the deposition of Ms. Barnes was not a *Rule 30(b)(6)* deposition.

## C. Count I: Common Law Fraud

In order to establish fraudulent misrepresentation under Illinois law, Dent-A-Med must show (1) a false statement of material fact; (2) knowledge or belief of the falsity by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the statement's truth; and (5) damage to the other party resulting from such reliance. *Neurosurgery & Spine Surgery v. Goldman, 339 Ill. App. 3d 177, 790 N.E.2d 925, 274 Ill. Dec. 152 (2003)*. Dent-A-Med alleges that Ms. Yanowsky and Ms. Weiner submitted charge slips and made other representations regarding dental work that they knew was either (1) not yet completed; (2) performed by unlicensed employees of the dental practice; or (3) was provided in a defective or substandard manner, and that it relied on these representations when making payments to the dental practice.

### 1. Susan Yanowsky

The undisputed facts, viewed in the light most favorable to the non-movant, show that Dent-A-Med cannot establish common law fraud against Ms. Yanowsky because Dent-A-Med cannot show that Ms. Yanowsky [*10] made any false statements of material fact. The parties do not dispute the facts pertaining to the fraud allegations against Susan Yanowsky: Ms. Yanowsky did not normally submit charge slips to Dent-A-Med; she did so only when Ms. Texter was on a one-week vacation (the dates of which are unknown); and all charge slips at issue were either signed by Ms. Texter or supplied no place for the signature of a dental practice employee. Ms. Yanowsky apparently had no other contact with Dent-A-Med and could have made no other representations upon which Dent-A-Med might have relied. Dent-A-Med's entire argument on this point is that "Ms. Yanowsky submitted charge slips." In short, the only possible basis for Ms. Yanowsky's liability is that she submitted "some" charge slips at "some" time; however, Ms. Yanowsky states in her affidavit that she did not submit the charge slips at issue. Additionally, Ms. Yanowsky states in her deposition that when she submitted charge slips, she signed them. In another section of its brief, Dent-A-Med claims that Ms. Texter "testified that the charge slips that do not bear her signature were submitted by Susan Yanowsky"; this statement, however, grossly misrepresents [*11] the record. Dent-A-Med's provided citation is incorrect and, as Ms. Texter admits submitting most of the unsigned charge slips and merely speculates as to who might have submitted those she disavows (this portion of Ms. Texter's deposition was *never* cited by Dent-A-Med), the statement makes little intuitive sense. As such, Dent-A-Med cannot demonstrate a genuine issue of material fact as to whether Ms. Yanowsky submitted charge slips and this Court thus grants Summary Judgment as to Susan Yanowsky.

### 2. Daisy Weiner

Dent-A-Med alleges that Ms. Weiner is liable for fraud on the basis of both her individual actions and as an alter ego for the various corporations (Lifetime Smiles, Inc., Lifetime Smiles, P.C., White Oak Dental, P.C., and DW Management) that comprised the dental practice.

#### a. Personal Liability

As is the case with Ms. Yanowsky, the parties do not dispute the central facts to a claim of personal liability for fraud against Ms. Weiner. Ms. Weiner submitted no charge slips to Dent-A-Med, but rather served as the bookkeeper for the dental practice in the evenings. She apparently had limited knowledge of the dental practice's day to day operations. Ms. Weiner [*12] had some tele-

phone conversations with Dent-A-Med employees following up on previously submitted charge slips.

Dent-A-Med claims that Ms. Weiner is personally liable for fraud because she made false representations "in her communications to Dent-A-Med seeking payment on charge slips and delivery of an NSF [insufficient funds] check to Dent-A-Med." Dent-A-Med never claims that Ms. Weiner's representations induced it to do anything it would not already have done - submit payments to the dental practice on the basis of previously submitted charge slips. Furthermore, Dent-A-Med's complaint never mentions an NSF check or, in fact, any check submitted by Ms. Weiner. A plaintiff may not amend his complaint by argument in a brief in opposition to a summary judgment motion. *Griffin v. Potter, 356 F.3d 824, 830 (7th Cir. 2004)*. Thus, Dent-A-Med's new allegations regarding this check are disregarded. Thus, this Court grants Defendants' Summary Judgment Motion as to Ms. Weiner's personal liability.

### b. Alter-Ego Liability

Additionally, Dent-A-Med alleges that Ms. Weiner is liable for the submission of charge slips by employees of the dental practice on the basis of alter [*13] ego liability. Generally, a corporation is a legal entity separate and distinct from its shareholders, directors, and officers; however, the corporate entity will be disregarded and the veil of limited liability pierced when two requirements are met: (1) there is such unity of interest in ownership that the separate personalities of the corporation and the individual no longer exist and (2) circumstances are such that adherence of the fiction of a separate corporate existence would sanction a fraud or promote injustice. *Van Dorn Co. v. Future Chemical & Oil Corp., 753 F.2d 565, 569-570 (7th Cir. 1985)*.

Defendants contend that the alter ego allegations were not pled with sufficient particularity to satisfy *Rule 9(b)*, and thus summary judgment ought to be granted. A party seeking to pierce the corporate veil and hold an officer, director, or shareholder liable for a corporation's fraud must plead its alter ego allegations in accordance with *Rule 9(b)*. *New Freedom Mortgage Corp. v. C & R Mortgage Corp., 2004 U.S. Dist. LEXIS 537, 2004 WL 783206 at *8 (N.D. Ill. Jan. 15, 2004)*. However, the proper remedy for failure to plead fraud with particularity in not summary judgment. *Molex Inc. V. Wyler, 365 F. Supp.2d 901, 912 (N.D. Ill. 2005)*; [*14] *Rash v. Minority Intermodal Specialists, Inc., 2003 U.S. Dist. LEXIS 4311, 2003 WL 1463476 (N.D. Ill. Mar. 20, 2003)*. Therefore, without determining whether Dent-A-Med pleads sufficient facts to satisfy *Rule 9(b)*, this Court declines to grant summary judgment on this basis. Defendants make no other arguments in favor of summary judgment on the alter ego claims.

### 3. DW Management

Summary judgment is also sought in favor of DW Management, Inc. because Dent-A-Med makes no allegations against it in the Second Amended Complaint. In the Second Amended Complaint, Dent-A-Med alleges that DW Management Company was formerly known as Lifetime Smiles, Inc., that Daisy Weiner used DW Management Company (along with other corporations) to facilitate the operation of the dental practice, and that DW Management Company made a loan to Daisy Weiner, its only shareholder, of $ 100,000. Dent-A-Med seeks no damages from DW Management. Dent-A-Med argues that summary judgment not be entered because "DW Management is only mentioned in the last sentence of Defendants . . . Motion for Summary Judgment." Because Dent-A-Med's complaint makes no allegations against DW Management and seeks no damages from it, this [*15] Court grants Defendants' Motion for Summary Judgment as to DW Management.

### D. Count: II: Illinois Consumer Fraud and Deceptive Business Practices Act

The Illinois Consumer Fraud and Deceptive Business Practices Act (hereinafter, the "Act") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce." *815 Ill. Comp. Stat. 505/2* (2002); *Pappas v. Pella Corp., 363 Ill. App. 3d 795, 844 N.E.2d 995, 998, 300 Ill. Dec. 552 (Ill. App. 2006)*. To succeed in a cause of action under the Act, a plaintiff must prove: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in the course of conduct involving trade or commerce; and (4) actual damage to the plaintiff (5) proximately caused by the deception. *Id.*

As an initial matter, [*16] the Defendants argue that Dent-A-Med has no standing to invoke the Act because it is an out-of-state corporation. A non-resident plaintiff may sue under the Act only if "the circumstances that relate to the disputed transaction occur 'primarily and substantially' within Illinois." *Avery v. State Farm Mut. Auto. Ins. Co., 216 Ill. 2d 100, 835 N.E.2d 801, 854, 296 Ill. Dec. 448 (Ill. 2005)*. The mere fact that an alleged fraud scheme was "devised in and disseminated from" Illinois is not sufficient to support a claim under the Act. *Id. at 854-855*. In *Avery*, a case alleging the deceptive failure to disclose the inferiority of certain

replacement auto parts by an insurance company, the Illinois Supreme Court determined that some possible class plaintiffs were not proper plaintiffs because the only circumstance of the alleged deceptive practice that occurred in Illinois was the creation of the insurance claims policies implemented elsewhere. *Id.* at 855. Every other fact surrounding the claim occurred outside of Illinois: the insured vehicles were garaged outside of Illinois, the accidents occurred outside Illinois, the estimates were written outside Illinois, the alleged [*17] deception took place outside Illinois when these estimates failed to disclose the inferiority of certain repair parts, the repairs took place outside Illinois, and the damage occurred outside Illinois. *Id.* There was, furthermore, no evidence that these plaintiffs had ever been in contact with an agent who worked in Illinois. *Id.* Likewise, in *In re Sears, Roebuck & Co., 2006 U.S. Dist. LEXIS 36323, 2006 WL 1443737 (N.D. Ill. May 17, 2006)* and *Crichton v. Golden Rule Ins. Co., 2006 U.S. Dist. LEXIS 56235, 2006 WL 2349961 (S.D. Ill. Aug. 11, 2006)*, the courts focused on the fact that plaintiffs had made no purchase in Illinois and had had no communications with the defendant's Illinois employees when holding that the plaintiffs did not have standing to sue. *See In re Sears 2006 U.S. Dist. LEXIS 36323, 2006 WL 1443737 at *3; Crichton, 2006 U.S. Dist. LEXIS 56235, 2006 WL 2349961 at *3.*

This case is not as lop-sided as *Avery, Sears,* or *Crichton.* Granted, Dent-A-Med, which is incorporated in Oklahoma and has its principal offices in Arkansas, received the allegedly fraudulent charge slips outside of Illinois and suffered damages outside Illinois. The dental practice, however, is situated in Illinois. All of the charge [*18] slips were prepared in Illinois and the work on which they were based was performed (or not performed) in Illinois. Dent-A-Med had contact with Ms. Weiner and Ms. Texter, representatives of the dental practice who worked in Illinois. Payments by Dent-A-Med were made to the dental practice in Illinois. Illinois, therefore, has more connection to the alleged fraud than the mere hatching of a scheme or creation of a corporate policy. As such, Dent-A-Med has standing to sue.

Next, Defendants contend that the Consumer Fraud Count is deficient because Dent-A-Med cannot show that the conduct alleged implicates consumer protection concerns. Because the Consumer Fraud Act is primarily concerned with the protection of consumers, a plaintiff other than a "consumer" must prove that the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns. *Ivanhoe Fin., Inc. v. Highland Banc Corp., 2004 U.S. Dist. LEXIS 18521, 2004 WL 2091997 (N.D. Ill. Sept. 15, 2004).* Dent-A-Med alleges that the various Defendants' actions implicates consumer protection concerns because the frauds affected the dental practice's patients by charging them for serves [*19] not provided - which could potentially "ruin the credit of these patients." Dent-A-Med has provided letters from the consumers showing that the Defendants' various actions have adversely affected traditional consumers. As such, the Consumer Fraud Claim can be maintained.

Lastly, Defendants argue that Dent-A-Med cannot establish that any material misrepresentations were made by either Ms. Weiner or Ms. Yanowsky because Dent-A-Med cannot show that either submitted charge slips. The parties make essentially the same arguments as in the above fraudulent misrepresentation claims. For the same reasons as stated above, this Court grants Defendants Summary Judgment on the Illinois Consumer Fraud and Deceptive Business Practices Act as to Ms. Yanowsky and Ms. Weiner's personal liability, but denies them as to Ms. Weiner's alter ego liability.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is **granted in part and denied in part,** as follows:

1. The Court grants Defendants' Motion for Summary Judgment on both the fraud and Illinois Consumer Fraud claims as to Susan Yanowsky and Daisy Weiner's personal liability; and

2. The Court denies [*20] Defendants' Motion for Summary Judgment as to Ms. Weiner's alter ego liability.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge

United States District Court

Dated: November 1, 2006

LEXSEE 1995 U.S. DIST. LEXIS 1754



Positive
As of: Jul 30, 2008

**BRADLEY SEARS and BRADWELL MIDWEST LIMITED, an Illinois Corporation, Plaintiffs, v. AMERICAN ENTERTAINMENT GROUP, INC., a Colorado Corporation, CORPORATEL INTERNATIONAL, INC., a Delaware Corporation, HARVE SHERMAN, and JOEL S-Z. WAGMAN, Defendants.**

**No. 94 C 0165**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1995 U.S. Dist. LEXIS 1754*

**February 10, 1995, Decided**
**February 13, 1995, DOCKETED**

**COUNSEL:** [*1]  For BRADLEY SEARS, BRADWELL MIDWEST LIMITED, an Illinois Corporation, plaintiffs: Paula K. Maguire, Gregory A. Friedman, Friedman & Holtz, P.C., Chicago, IL.

For AMERICAN ENTERTRAINENT GROUP, INC., a Colorado corporation, CORPORATEL INTERNATIONAL, INC., a Delaware corporation, HARVE SHERMAN, JOEL S-Z WAGMAN, defendants: Gary E Green, Martin & Karcazes, Ltd, Chicago, IL. R Nicholas Palmer, Jeffrey A. Esses, Palmer & Paoli, P.C., Denver, CO.

For AMERICAN ENTERTRAINENT GROUP, INC., CORPORATEL INTERNATIONAL, INC., counter-claimants: Gary E Green, Martin & Karcazes, Ltd, Chicago, IL. R Nicholas Palmer, Jeffrey A. Esses, Palmer & Paoli, P.C., Denver, CO.

For BRADLEY SEARS, counter-defendant: Paula K. Maguire, Gregory A. Friedman, Friedman & Holtz, P.C., Chicago, IL. For BRADWELL MIDWEST LIMITED, counter-defendant: Paula K. Maguire, Gregory A. Friedman, Friedman & Holtz, P.C., Chicago, IL. Gregory a. Friedman, Law Offices of arthur S. Gomberg, Chicago, IL.

**JUDGES:** David H. Coar, U.S. District Judge

**OPINION BY:** David H. Coar

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiffs have served a Notice of Deposition on Defendants for the depositions of Joel S-Z Wagman, Harve Sherman, Jerry Hugo and Mark A. Stevens. The depositions were to have been held on four different days in January, 1995, at the offices of plaintiffs' counsel in Chicago, Illinois. Wagman, Sherman and Hugo reside in Toronto, Canada; Stevens resides in Atlanta, Georgia. All four deponents are officers of defendant American Entertainment Group, Inc., which maintains its principal place of business in Toronto, Canada. Defendants move for entry of a protective order requiring the depositions to proceed in Toronto, Canada, at mutually convenient dates and times.

In their motion for protective order, defendants initially argue that the Notice of Deposition is defective. This argument is well taken. The Notice does not identify whether the deposition is being taken pursuant to *Federal Rule of Civil Procedure 30(b)(1)* or *30(b)(6)*. Since plaintiff has designated the deponents, the Notice cannot be made pursuant to *Rule 30(b)(6)*. **See *Fed. R. Civ. Proc. Rule 30(b)(6)*; *Operative Plasterers' & Cement Masons' Int'l Assoc. of U.S. & Canada v. Benjamin*, 144 F.R.D. 87, 89 (N.D. Ind. 1992).** [*2]  The Notice is defective under *Rule 30(b)(1)* because it does not

designate whether the deponents are to testify on behalf of AEG or in their individual capacities. See *Benjamin, 144 F.R.D. at 89-90.*

In addition to this technical deficiency, defendants object to the Notice because they believe that the proper situs for the depositions is Toronto, Canada. It is well established that "as a general rule, the deposition of a corporation by its agents and officers should be taken at its principal place of business. . . . particularly when the corporation is a defendant." *Zuckert v. Berkliff Corp., 96 F.R.D. 161, 162 (N.D. Ill. 1982)*; accord *Magnus Electronics, Inc. v. Masco Corp. of Ind., 871 F.2d 626, 630 (7th Cir. 1989)*; see also **8 Wright & Miller, Federal Practice & Procedure: Civil § 2112,** at 410 (1970). Where a corporation has objected to a deposition noticed for a location other than its principal place of business, "the objection should be sustained unless there are unusual circumstances which justify such an inconvenience to the corporation." *Zuckert, 96 F.R.D. at 162*; [*3] see also *Benjamin, 144 F.R.D. at 89* (a deposition of an organization, through its officers or agents, should be taken at its principal place of business, unless justice requires otherwise).

The court has very broad discretion under *Rule 26(c)(2)* to alter the place and time of deposition. See *Afram Export Corp. v. Metallurgiki Halyps, S.A., 772 F.2d 1358, 1365 (7th Cir. 1985)*. The standard for entry of a protective order is "good cause;" within the context of this case, defendants may establish "good cause" by showing that AEG would be subject to "annoyance, embarrassment, oppression, or undue burden or expense" if the four depositions proceeded in Chicago. See **Fed. R. Civ. Pro. Rule 26(c)**; *Kasper v. Cooper Canada Ltd., 120 F.R.D. 58, 59 (N.D. Ill. 1988)*. The purposes underlying the general rule that the depositions should proceed at the corporation's principal place of business create a presumption that the defendants have good cause for a protective order under *Rule 26(c)*. In addition, as detailed below, defendants have affirmatively demonstrated good cause through Joel Wagman's [*4] affidavit. Since plaintiffs have noticed the depositions for Chicago, Illinois, they have the burden to establish that unusual circumstances or principles of justice require the court to deviate from the general rule that the depositions should proceed at the corporation's principal place of business in Toronto, Canada. The plaintiffs have not satisfied their burden.

Sears' claim of financial hardship is unsubstantiated and unconvincing. First, Sears has not represented, much less demonstrated, that he lacks sufficient funds to pay the expenses that his counsel will incur in taking depositions in Toronto. Second, as defendants correctly argue, the fact that Sears has retained his counsel on a contingency basis sheds absolutely no light on his financial status. Third, Sears's representations about Bradwell Midwest Ltd.'s financial status are lacking in foundation, constitute inadmissible hearsay and are outdated. Finally, fourth, the costs of a roundtrip ticket from Chicago to Toronto with two weeks notice is only $ 340.00, [1] a sum that is comparatively inconsequential given the amount in dispute between the parties.

> 1 Per a United Airlines Ticket Agent. The price was quoted on February 9, 1995, and, of course, is subject to change without notice.

[*5] Sears's claim that travelling to Toronto for the depositions will impose a hardship for his current employer is equally unconvincing. First, his statements on this subject are entirely self-serving and have not been supported by an affidavit from his employer. Second, Sears has the right to attend the depositions, but his attendance is not mandated by the Rules. He certainly may choose to attend the depositions for strategic purposes, but if he elects to do so, he must bear the costs that accompany his decision. Third, regardless of the location, if Sears elects to attend the depositions, he would still miss work and his employer would still be disadvantaged. His arguments concerning convenience of counsel and judicial economy are similarly unpersuasive.

The totality of plaintiffs' arguments on this subject do not establish a basis for this court to deviate from the general rule that the depositions should proceed at AEG's principal place of business in Toronto, Canada. Sears has not established unusual circumstances or injustice. In fact, AEG has established via affidavit a more compelling argument that having four of its officers deposed in Chicago (a city in which it does not [*6] presently maintain a business office [2]) on four different days will impose a significant cost on the company in terms of lost time, manpower and expenses. [3]

> 2 Wagman Affidavit, at P4.
> 3 Moreover, because these four officers are "actively involved in ongoing financial and acquisition activities with a target date of February 28, 1995, which activities are crucial to the future viability of AEG" (Wagman Aff., at P6), this court in its discretion orders that the depositions proceed on mutually agreeable (and ideally consecutive) dates after March 7, 1995, but in any event before May 7, 1995.

Finally, plaintiffs argue that defendants have filed a permissive counterclaim and, as a result, should be treated as a party plaintiff for purposes of any deposition. See *Zuckert, 96 F.R.D. at 162* (citation omitted). However, if the counterclaim is compulsory, the defendant/counterplaintiff "remains entitled to protection from

deposition anywhere but for his or her residence or business [*7] location." **Id.** *Rule 13(a)* provides:

> Compulsory counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. . . .

*Fed. R. Civ. Pro. Rule 13(a).* According to the Seventh Circuit, a "'transaction' may comprehend a series of many occurrences, depending not so much on the immediateness of their connection as upon their logical relationship." *Warshawsky Co. v. Arcata Nat'l Corp., 552 F.2d 1257, 1261 (7th Cir. 1977).* Under this standard, it is clear that AEG's counterclaim is compulsory. Plaintiffs allege that defendants have, *inter alia,* breached an employment agreement. AEG, in turn, alleges in its counterclaim that Sears fraudulently induced it into entering and subsequently ratifying the employment agreement that is the subject matter of plaintiffs' complaint. The defendants/counterplaintiffs are therefore entitled [*8] to be deposed at their corporate offices in Toronto, Canada. See *Zuckert, 96 F.R.D. at 162-63.*

WHEREFORE, for the foregoing reasons, defendants' Motion for Protective Order is GRANTED. Plaintiffs shall issue Amended Notices of Depositions that comply with *Rule 30(b)(1).* The depositions shall take place in Toronto, Canada, on mutually agreeable dates after March 7, 1995 but not later than May 7, 1995.

ENTER:

David H. Coar

U.S. District Judge

Date: February 10, 1995

LEXSEE 144 FRD 87



Analysis
As of: Jul 30, 2008

### OPERATIVE PLASTERERS' & CEMENT MASONS' INTERNATIONAL ASSO-CIATION OF THE UNITED STATES AND CANADA AFL-CIO, et al., Plaintiffs, v. JAMES E. BENJAMIN, Defendant.

### CAUSE NO. S91-239 (RLM)

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, SOUTH BEND DIVISION

### *144 F.R.D. 87; 1992 U.S. Dist. LEXIS 15703; 24 Fed. R. Serv. 3d (Callaghan) 835*

### October 15, 1992, Decided
### October 15, 1992, Entered

**COUNSEL:** [**1]  Plaintiffs were represented by Barry A. Macey of Indianapolis, IN and R. Richard Hopp of Washington, D.C.

Defendant was represented by Charles L. Berger of Evansville, IN.

**JUDGES:** Pierce

**OPINION BY:** ROBIN D. PIERCE

**OPINION**

[*88]  **MEMORANDUM AND ORDER**

On May 29, 1992, defendant, James E. Benjamin, served notices to take the oral depositions of four individuals at the offices of Mr. Benjamin's counsel in Evansville, Indiana. The notices identified the proposed deponents as "Mr. Beam," "Vince Panepinto," "Dominic Martell" and "Mr. Martinez" and stated that the depositions [*89] were being taken pursuant to "*Federal Rules of Civil Procedure 26, 30(b)(6) and 32(a)(2)*." All of the named individuals are present or former officers of plaintiff Operative Plasterers' & Cement Masons' International Association of the United States and Canada AFL-CIO (the "International"), which has its principal office in Washington, D.C. According to plaintiffs, Robert T. Beam, Vice President of the International and General Executive Board Member, lives near San Francisco, California; Vincent J. Panepinto, International General

President, is a Virginia resident; Dominic Martell, International General Secretary-Treasurer, also resides in Virginia; [**2]  and Harry D. Martinez, Jr., retired Vice President of the International lives near Los Angeles, California.

On July 16, 1992, plaintiffs filed a motion for protective order, requesting "(1) that these depositions not be held, *Fed.R.Civ.P. 26(c)(1)*, or in the alternative (2) that the scope of the depositions be limited to certain matters, *Fed.R.Civ.P. 26(c)(4)*, or *(3)* that the information may be acquired only by a method of discovery other than that selected by the Defendant, *Fed.R.Civ.P. 26(c)(3)*, *(4)* that the depositions be held only at a designated place, *Fed.R.Civ.P. 26(c)(2)* or *(5)* that the Defendant enter into an appropriate confidentiality agreement, *Fed.R.Civ.P. 26(c)(6)* and *(7)*." Mr. Benjamin subsequently filed a motion to compel discovery on August 6, 1992, and a memorandum in opposition to plaintiff's motion for protective order and in support of his motion to compel on August 28, 1992. In his memorandum in opposition, Mr. Benjamin argues that he properly gave notice to take the depositions; that the information sought is relevant and necessary to adequately defend this action; and that there are no justifiable grounds for restricting or limiting his discovery by these [**3] depositions.

Plaintiffs' initial objections are concerned with the propriety of the deposition notices. In this regard, plaintiffs maintain that *Rule 30(b)(6)* does not authorize Mr. Benjamin to select who will be the plaintiffs' organiza-

144 F.R.D. 87, *; 1992 U.S. Dist. LEXIS 15703, **;
24 Fed. R. Serv. 3d (Callaghan) 835

tional representatives, and that Mr. Benjamin has failed to "describe with reasonable particularity the matters on which examination is requested," as required by *Rule 30(b)(6)*. The court must agree that the deposition notices are defective.

Prior to the 1970 amendments to the Federal Rules of Civil Procedure, a party seeking to take the deposition of a corporation, partnership, association, or government agency was required to identity the official to be deposed on behalf of the organization. 4A J. Moore, J. Lucas & D. Epstein, *Moore's Federal Practice* P 30.57 [13] (2d ed 1992). *Rule 30(b)(6)*, which was added in 1970, provided an alternative procedure for taking the deposition of an organization. Under this procedure, the party taking the deposition need only describe the subject matter of the examination, and the organization is then required to select and produce the persons who will testify on its behalf. *Rule 30(b)(6)* thus provides as follows:

[**4]  A party may in the party's notice and in a subpoena *name as the deponent* a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. A subpoena shall advise a non-party organization of its duty to make such designation. *The persons so designated shall testify as to matters know or reasonably available to the organization.* This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules.

(emphasis supplied.)

In this case, the deposition notices state that the depositions are being taken pursuant to *Rule 30(b)(6)*, but they are otherwise inconsistent with the procedure described in *Rule 30(b)(6)*. They name specific individuals as the deponents, rather than an organization; they fail to describe the subject matter of the proposed examination; [*90] and they give no [**5] indication, apart from the bare citation of *Rule 30(b)(6)*, that the deponents were expected to testify on behalf of the International. Certainly, this is not to say that Mr. Benjamin is precluded from taking the deposition of the International through its officials and representatives -- just that he did not follow the proper procedure if that was what he was trying to accomplish.

Mr. Benjamin could have named particular officers to testify on behalf of the International and he could have done so without being required to specify the subject matter of his proposed examination, by simply noticing the depositions under *Rule 30(b)(1)*, and by indicating

that the persons named would be expected to testify on behalf of the International. That would have been the customary practice prior to the adoption of *Rule 30(b)(6)*, and it remains an available alternative for a party who is aware of a particular individual possessing the authority to testify on behalf of an organization on a desired subject. *See Moore v. Pyrotech Corp.,* 137 F.R.D. 356, 357 (D.Kan. 1991); *GTE Products Corp. v. Gee,* 115 F.R.D. 67, 68 (D.Mass. 1987); *Sugarhill Records Ltd. v. Motown Record Corp.,* 105 F.R.D. 166, 169 (S.D.N.Y. 1985);  [**6]  4A J. Moore, J. Lucas & D. Epstein, *Moore's Federal Practice* P 30.57 (13) (2d ed. 1992); 8 Wright & Miller, *Federal Practice and Procedure: Civil* § 2103, at 374-75 (1970).

Because the deposition notices here are defective under *Rule 30(b)(6)*, plaintiffs' motion for protective order is granted with respect to the depositions as noticed. Mr. Benjamin, however, may proceed with the depositions of Mr. Beam, Mr. Panepinto and Mr. Martell, upon proper notice under *Rule 30(b)(1)*. Each deposition notice should clearly indicate that the deposition is being taken of the organization through the named official or representative. The person designated in the notice will then be ejected to testify to matters known or reasonably available to the organization, as under *Rule 30(b)(6)*.

Mr. Benjamin's proposal to take the deposition of Mr. Martinez as an official or representative of the International presents a further problem. Plaintiffs have indicated, without contradiction, that Mr. Martinez is retired. Consequently, Mr. Martinez would no longer have the authority to testify on behalf of the International, and certainly the International would have no control over him or obligation to  [**7]  produce him for a deposition on its behalf, whether under *Rule 30(b)(1)* or *Rule 30(b)(6)*. Plaintiffs' motion for protective order is, therefore, granted with respect to the deposition of Mr. Martinez Should Mr. Benjamin wish to take the deposition of Mr. Martinez regarding matters within his knowledge, he must proceed as in the case of any other individual nonparty witness residing beyond this court's subpoena range. *See Harris Corp. v. Amperex Electronic Corp.,* slip op. (N.D. Ill. 1987) *(1987 U.S. Dist. LEXIS 14108);* 4 J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* P 26.70 [1.-1] (2d ed. 1991).

Plaintiffs further contend that they are entitled to a protective order directing that the discovery either not be had or that it be limited because the anticipated testimony would not be relevant to the subject matter of the present action. The court, however, believes that Mr. Benjamin has made a sufficient, though minimal, showing that the depositions would be reasonably calculated to lead to the discovery of admissible evidence and would be relevant to the subject matter of this action, including his defenses. *See* [**8]  8 Wright & Miller,

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 12 of 42

Page 3

144 F.R.D. 87, *; 1992 U.S. Dist. LEXIS 15703, **;
24 Fed. R. Serv. 3d (Callaghan) 835

*Federal Practice and Procedure* § 2008 at 46-47 (1970). Consequently, plaintiffs' request for an order limiting the scope of the depositions, or directing that they not be had, is denied.

Plaintiffs also maintain that Mr. Benjamin should be required to utilize alternative and less oppressive discovery devices in lieu of oral depositions or that the court should not require the individual deponents to travel the long distances between their present locations and the offices of Mr. Benjamin's counsel in Evansville, Indiana. The court declines to order that the proposed discovery be conducted other than by [*91] oral deposition, but the court does consider it appropriate to require that the depositions be taken at the International's principal place of business in Washington, D.C.

Customarily, the deposition of an organization, through its officers or agents, should be taken at its principal place of business, unless justice requires otherwise. *Moore,* 137 F.R.D. at 357; *Dollar Systems, Inc. v. Tomlin,* 102 F.R.D. 93 (M.D. Tenn. 1984); *Dunn v. Standard Fire Ins. Co.,* 92 F.R.D. 31, 32 (D. Tenn. 1981); [**9] 4 J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* P 26.70 [1.-4] (2d ed 1991); 8 Wright & Miller, *Federal Practice and Procedure:* Civil § 2112, at 410 (1970). Although it is also well-established that "a plaintiff having selected a particular forum for the adjudication of his case should be prepared to answer a notice of deposition in that locality," *Ellis Air Lines v. Bellanca Aircraft Corp.,* 17 F.R.D. 395, 396 (D.Del. 1955); *de Dalmady v. Price Waterhouse & Co.,* 62 F.R.D. 157, 158 (D.P.R. 1973), this principle loses weight where, as here, the plaintiff had no choice of forum. *Ellis Air Lines,* 17 F.R.D. at 396.

In this case, justice does not require a departure from the general rule that the deposition of an organization should be taken at its principal place of business. Plaintiffs maintain that none of the named individuals has personal knowledge of Mr. Benjamin's actions as alleged in the complaint. Their apparently minimal involvement is also suggested by the fact that Mr. Benjamin scheduled their depositions at one-hour intervals. These circumstances suggest that [**10] Mr. Benjamin, rather than the International and its officers, should assume the expense and inconvenience of obtaining this discovery. Accordingly, the court will require that the depositions of Mr. Beam, Mr. Panepinto and Mr. Martell be conducted, upon proper notice, at the International's principal place of business.

As a final matter, plaintiffs assert that a protective order is needed in order to preserve the confidentiality of information developed through the depositions and to prevent its disclosure to a rival third-party organization, the laborers District Counsel No. 57. The use of a protective order to prevent the disclosure of confidential information is decribed in *Fed.R.Civ.P. 26(c)* which provides, in pertinent part, as follows:

Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated [**11] way. . . .

Under these provisions, the party seeking a protective order bears the burden of demonstrating "good cause" to support the issuance of such an order. *Baker v. Liggett Group, Inc.,* 132 F.R.D. 123, 125 (D. Mass. 1990); *Litton Industries v. Chesapeake & Ohio Ry.,* 129 F.R.D. 528, 529 (E.D. Wis. 1990); *Cuno Inc. v. Pall Corp.,* 117 F.R.D. 566, 508 (E.D. N.Y. 1987); *U.S. v. Hooker Chemicals & Plastics Corp.,* 90 F.R.D. 421, 425 (W.D. N.Y. 1981). "To successfully carry the burden of establishing good cause, a party moving for a protective order must demonstrate a particular need for protection. There must be evidence that a clearly defined and serious injury will result if discovery is allowed." 2 Shepard's, *Discovery Proceedings In Federal Court* § 10.2, at 4-5 (2d ed. 1991). In this regard, courts have generally required a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements. . . ." 8 C. Wright & A. Miller, *Federal Practice And Procedure* 2035, at 265 (1970); *see Anderson v. Cryovac, Inc.,* 805 F.2d 1, 7 (1st Cir. 1986); [**12] *United States v. Exxon Corp.,* 94 F.R.D. 250, 251 (D.D.C. 1981); *Hooker,* 90 F.R.D. at 425; *Reliance Insurance Co. v. Barron's,* 428 F. Supp. 200, 202-03 (S.D.N.Y. 1977). Where, as here, a party is seeking protection with respect to confidential business information, it must demonstrate that the information sought is, indeed, confidential and that disclosure [*92] might be harmful to its business. *American Standard Inc. v. Pfizer Inc.,* 828 F.2d 734, 740 (Fed. Cir. 1987); *Exxon,* 94 F.R.D. at 251; *Parsons v. General Motors Corp.,* 85 F.R.D. 724, 726 (N.D. Ga. 1980); *United States v. IBM Corp.,* 67 F.R.D. 40, 46 (S.D.N.Y. 1975).

Plaintiffs' showing in this case is insufficient They have failed to describe, with any degree of particularity, the nature of the information sought to be protected, why it is confidential, and how disclosure might be harmful to their organizations. Plaintiffs' request for a protective order prohibiting disclosure of information developed during the depositions [**13] is, therefore, denied.

For the foregoing reasons, plaintiffs' motion for protective order is **GRANTED**, in part, and **DENIED**, in

144 F.R.D. 87, *; 1992 U.S. Dist. LEXIS 15703, **;
24 Fed. R. Serv. 3d (Callaghan) 835

part, and Mr. Benjamin's motion to compel discovery is **DENIED.** Within seven (7) days of this date, counsel for plaintiffs and defendant shall consult for the purpose of making arrangements for the depositions of Mr. Beam, Mr. Panepinto and Mr. Martell, in accordance with this order, provided that defendant still wishes to proceed with the taking of those depositions. If so, such depositions shall be concluded within twenty (20) days of this date. Defendant shall thereafter file his response to plaintiffs' motion for partial summary judgment, within forty-five (45) days of this date.

**SO ORDERED.**

Dated this 15th day of October, 1992.

Robin D. Pierce, U.S. Magistrate Judge

LEXSEE 2005 US DIST LEXIS 59



Caution
As of: Jul 30, 2008

**JAMSPORTS AND ENTERTAINMENT, LLC, Plaintiff, vs. PARADAMA PRO-
DUCTIONS, INC., Defendant.**

**Case No. 02 C 2298**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION**

*2005 U.S. Dist. LEXIS 59; 2005-1 Trade Cas. (CCH) P74,672*

**January 3, 2005, Decided
January 4, 2005, Docketed**

**SUBSEQUENT HISTORY:** Motion denied by *Jams-
ports & Entm't, LLC v. Paradama Prods., 360 F. Supp.
2d 905, 2005 U.S. Dist. LEXIS 4583 (N.D. Ill., Mar. 13,
2005)*

**PRIOR HISTORY:** *JamSports & Entmt, LLC v.
Paradama Prods., 2004 U.S. Dist. LEXIS 25601 (N.D.
Ill., Dec. 20, 2004)*

**DISPOSITION:** Certain non-parties' motion to quash
subpoenas terminated. Defendant's motion to quash sub-
poena or for protective order granted. Defendant's objec-
tion to the use of videotaped testimony is overruled.
Plaintiff's motion in limine and defendants' motion in
limine granted in part and denied in part. Defendant's
motion to clarify the final pretrial order terminated.

**COUNSEL:** [*1] For JAMSPORTS AND ENTER-
TAINMENT, LLC, Plaintiff: Bruce S. Sperling, Greg
Shinall, Robert David Cheifetz, Thomas David Brooks,
Sperling & Slater, Chicago, IL; James David Roberts,
DLA Piper Rudnick Gray Cary US LLP, Chicago, IL;
Jeffrey Singer, Segal, McCambridge, Singer & Ma-
honey, Ltd., Chicago, IL; Heather Elaine Ross, Legal
Assistance Foundation of Chicago, Chicago, IL; Phillip
Mark Crane, Paul E. Wojcicki, Segal, McCambridge,
Singer & Mahoney, Ltd., Chicago, IL; Margaret Egan
Lawler, DLA Piper Rudnick Gray Cary US LLP, Chi-
cago, IL.

For PARADAMA PRODUCTIONS, INC. DBA AMA
PRO RACING, Defendant: Steven F. Pflaum, Sandra A.
Muhlenbeck, Matthew Boyd Steffens, Mark Jacob Alt-
schul, McDermott, Will & Emery LLP, Chicago, IL;
James David Roberts, DLA Piper Rudnick Gray Cary US
LLP, Chicago, IL; Kevin L Shoemaker, Shoemaker,
Winkler, Howarth & Taylor, LLP, Columbus, OH;
Timothy J Owens, Owens & Krivda Co., L.P.A., Colum-
bus, OH.

For CLEAR CHANNEL COMMUNICATIONS, INC.,
SFX ENTERTAINMENT, INC. DBA CLEAR CHAN-
NEL ENTERTAINMENT, SFX MOTOR SPORTS,
INC. DBA CLEAR CHANNEL ENTERTAINMENT-
MOTOR SPORTS, Defendants: Lee A. Freeman, Jr.,
James T. Malysiak, Chris C. Gair, Joseph Paul
Adamczyk, Freeman, [*2] Freeman & Salzman, P.C.,
Chicago, IL.

**JUDGES:** MATTHEW F. KENNELLY, District Judge.

**OPINION BY:** MATTHEW F. KENNELLY

**OPINION**

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In this Memorandum Opinion, the Court rules on the
parties' motions *in limine* and various other pretrial mat-
ters.

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 15 of 42

Page 2

2005 U.S. Dist. LEXIS 59, *; 2005-1 Trade Cas. (CCH) P74,672

## A. Clear Channel's motion to quash trial subpoena to Randall Mays

Clear Channel has moved to quash a trial subpoena served by JamSports on Clear Channel's executive vice president and chief financial officer Randall Mays, who lives and works in Texas. [1] *Rule 45(b)(2)* provides where a trial subpoena may be served:

> Subject to the provisions of clause (ii) of subparagraph (c)(3)(A) of this rule, a subpoena may be served at any place within the district of the court by which it is issued, or at any place without the district that is within 100 miles of the place of the ... trial ... or at any place within the state where a state statute or rule of court permits service of a subpoena issued by a state court of general jurisdiction sitting in the place of the ... trial ....

*Fed. R. Civ. P. 45(b)(2)*. Mays was not served [*3] within this district, the 100-mile "bulge," or the state of Illinois.

> 1    JamSports took Mays' deposition on video during the course of discovery.

JamSports opposes the motion to quash, relying on *Rule 45(c)(3)(A)*, which is cross referenced in *Rule 45(b)(2)*. *Rule 45(c)(3)(A)* provides that

> on timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
>
> . . .
>
> (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person....

*Fed. R. Civ. P. 45(c)(3)(A)(ii)*. According to JamSports, the cross-referencing of this provision in *Rule 45(b)(2)* expands the geographic reach of a court's subpoena power with regard to a person who *is* "a party or an officer of a party." It relies on decisions by several courts that have so held. *See, e.g., Ferrell v. IBP, Inc.,* No. C98-4047, 2000 WL 34032907 [*4] (N.D. Iowa Apr. 28, 2000); *Archer Daniels Midland Co. v. Aon Risk Servs., Inc.,* 187 F.R.D. 578, 587 (D. Minn. 1999); *Stone v. Morton Int'l, Inc.,* 170 F.R.D. 498, 500-01 (D. Utah. 1997).

The Court disagrees. Nothing in the history of the adoption of *Rule 45(c)(3)(A)* suggests that it was intended to alter the longstanding geographic limitations on the reach of a district court's subpoena power. Nor does the text of the Rule support the reading proposed by JamSports or in the cases upon which it relies. *Rule 45(c)(3)(A)* does not confer authority for service of a subpoena; it confers authority to quash or modify a subpoena. It provides an exception to *Rule 45(b)(2)*, not an addition to that Rule. *See Johnson v. Land O'Lakes, Inc., 181 F.R.D. 388, 396-97 (N.D. Iowa 1998)*.

Read in context, the cross-reference of *Rule 45(c)(3)(A)(ii)* in *Rule 45(b)(2)* is meant to reflect that even if service of a subpoena is otherwise proper under *Rule 45(b)(2)*, the subpoena is to be quashed if it imposes a requirement identified in *Rule 45(c)(3)(A)(ii)*. Specifically, even if a subpoena is *served* within the geographic boundaries of a district, outside [*5] the district but within 100 miles of the place of trial, or outside the state in which the district lies, it must be quashed if it requires a non-party witness to *travel* more than 100 miles from where he or she resides, employs, or regularly transacts business. To provide a concrete example, a witness who lives and works in Galena, Illinois can properly be served with a subpoena under *Rule 45(b)(2)* to appear at a trial in Chicago, because Galena is within the Northern District of Illinois. But if the witness is not a party or officer of a party, she is entitled under *Rule 45(c)(3)(A)(ii)* to have the subpoena quashed, because it would require her to travel more than 100 miles.

For these reasons, the Court grants Clear Channel's motion to quash and for a protective order with respect to JamSports' trial subpoena addressed to Randall Mays.

## B. Treatment of "highly confidential" documents

Early in discovery, upon Clear Channel's request and with the concurrence of JamSports and AMA Pro, the Court entered a protective order which, among other things, permitted parties to designate documents containing certain types of proprietary information as "highly confidential" and [*6] thereby limit access to outside counsel and retained experts. The records in question include business plans and projections, breakdowns of expenses and revenues, and an agreement with an entity called Dorna Off Road, S.L. Clear Channel argued, in support of the request for a protective order, that disclosing this information to its potential competitors (JamSports) and companies with whom it negotiates business deals (AMA Pro) would cause Clear Channel competitive harm. The Court has asked the parties to address how such documents should be treated at trial.

Clear Channel has listed twenty or so documents designated as highly confidential that have been listed as

2005 U.S. Dist. LEXIS 59, *; 2005-1 Trade Cas. (CCH) P74,672

exhibits by JamSports. Clear Channel requests that these documents not be admitted as trial exhibits or, if admitted, that they be placed under seal and not made part of the public record, and that the restrictions on dissemination remain intact, in other words, that there be no dissemination to party representatives other than outside counsel and experts. Clear Channel also requests entry of an order barring the parties and counsel from disseminating any highly confidential information that may be revealed during the trial. [*7] However, Clear Channel does not seek to exclude anyone from the courtroom during trial. *See Clear Channel Reply Mem. Regarding Use of "Highly Confidential" Documents at 6.* JamSports opposes any restrictions at trial and asks that its outside counsel now be permitted to disclose the contents of the highly confidential documents to the client. AMA Pro also seeks permission for its outside counsel to review the documents with the client.

The public has a right of access to trials as well as to judicial records and documents, which prevails over any countervailing interests absent a showing of good cause for sealing the record in a particular case in whole or in part. *See, e.g., Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co., 178 F.3d 943, 945 (7th Cir. 1999); Smith v. United States District Court, 956 F.2d 647, 649-50 (7th Cir. 1992).* Good cause may be established by showing that particular information amounts to a trade secret such that disclosure would put the holder at a competitive disadvantage if made public. *See, e.g., In re Adobe Systems, Inc. Securities Litig., 141 F.R.D. 155, 158, 161 (N.D. Cal. 1992); [*8] see also, e.g., Baxter Int'l, Inc. v. Abbott Laboratories, 297 F.3d 544, 545 (7th Cir. 2002)* (legitimate trade secret may be kept out of public record); *Union Oil Co. of California v. Leavell, 220 F.3d 562, 567 (7th Cir. 2000)* (same).

In support of its request for ongoing restrictions at trial, Clear Channel has submitted the affidavit of its president, Charles Mancuso, that it submitted in support of its request for protective order in March 2003. As an initial matter, Mancuso's affidavit does not provide a basis for ongoing highly confidential treatment of the agreement with Dorna (JX 613 & 666). The highly confidential designation for this document is removed; it is to be treated as a "confidential" document under the protective order.

Nearly all of the remaining documents at issue are budgeting and revenue records which break down projected and actual revenues and expenses by event and by item. Mancuso Aff. PP 4-8. Mancuso states that access to these documents is highly restricted within Clear Channel itself to a handful of executive and that the information they contain is highly proprietary and not publicly available. *Id.* PP 9-14, 16. He [*9] states that disclosure of these records to a potential competitor like JamSports

would enable use of the information to undercut Clear Channel with companies with which it does business by disclosing, for example, what Clear Channel pays for various services. It would also permit a competitor to learn which venues and events are less profitable and thereby plan events around such locations and events. Disclosure of Clear Channel's financial data to AMA Pro, Mancuso states, would allow AMA Pro to have access to information that it could use to its advantage and Clear Channel's disadvantage in future negotiations between the two companies over sanctioning fees. *Id.* PP 17-23.

The other documents are strategic plans, which Mancuso says likewise are highly restricted within Clear Channel. Disclosure of such documents, Mancuso contends, would give potential competitors insights that would allow undercutting or replication of the company's plans. *Id.* P 26.

JamSports contends that Mancuso's affidavit is stale and does not support ongoing restrictions. The Court finds the affidavit sufficient to establish the need for confidentiality of the current and relatively current information [*10] Mancuso describes as well as a significant possibility of a serious and clearly defined injury to Clear Channel if that information were disclosed. But JamSports has a point with regard to older information. The records designated as highly confidential include information as far back as 1997. It is difficult to see, and Mancuso's affidavit is insufficient to establish, how reduction to ordinary "confidential" status of older information -- at a minimum, information for years predating the filing of the lawsuit in 2002 -- would cause harm to Clear Channel. Without such a showing, the Court is not persuaded that information concerning those years can properly be designated highly confidential and kept out of the public record.

With regard to information as to which a showing of good cause has been made, the Court believes that the appropriate mechanism for accommodating Clear Channel's interests, the public's right of access, and the needs of the other parties is as follows:

> 1) The Court will not enter a blanket order precluding any party from offering the identified highly confidential exhibits in evidence. However, the party offering any such exhibit will be required to explain [*11] the relevance and probative value of the particular document and why it needs the document admitted in evidence -- as opposed to, for example, simply allowing an expert to rely on the document without having it admitting it in evidence.

*See Fed. R. Evid. 703* (allowing expert to rely on data not admitted at trial).

2) Any highly confidential document that is admitted in evidence will, of course, be available to the jury, and no one will be excluded from the courtroom during use or discussion of the document. However, any such document will be admitted under seal and will not become part of the public record. Counsel and any officer, director, employee, agent, or attorney of a party who is present in the courtroom are barred from disclosing the document or its contents.

3) The Court obviously understands that all else being equal, it is important for trial counsel to be able to discuss the evidence with client representatives. But neither JamSports nor AMA Pro has made any effort to provide the Court with any particularized explanation of why they need to be able to discuss with their clients the contents of the remaining highly confidential documents. Absent such an explanation, [*12] there is no basis to remove that particular restriction as to documents that retain the highly confidential designation.

**C. Use of videotaped deposition testimony by JamSports**

Clear Channel objects to JamSports' use in its case in chief of the videotaped depositions of Richard Gray and P.J. Harvey, who are members of the board of directors of defendant AMA Pro. It says these witnesses are available to testify live and argues that JamSports should be required to call them in its case, using the depositions only where inconsistent with their live testimony.

The Court rejects this argument. Under *Federal Rule of Civil Procedure 32(a)(2)*, a party may use in evidence for any purpose the deposition of an officer, director, or managing agent of an opposing party. By virtue of this Rule, JamSports is not required to call the witnesses "live" in its case and use the depositions merely for impeachment purposes.

On the other hand, *Rule 32(a)(2)* does not abrogate the Court's authority to regulate the mode and order of interrogating witnesses, *see Fed. R. Evid. 611(a)*, or its authority to exclude evidence [*13] whose probative value is outweighed by, among other things, its need-

lessly cumulative nature, *see Fed. R. Evid. 403*. The Court can and will exercise this authority. If JamSports elects to proceed in its case by using deposition excerpts rather than by calling witnesses live, it will be required to provide, in advance of trial, a designation of the testimony to be offered, and an accurate statement of how long each videotaped presentation will take. The Court will carefully examine the designated testimony for cumulativeness. In addition, if JamSports presents the testimony of such a witness by deposition in its case in chief, and the witness is later called by the defense, JamSports cannot expect that it will be able to reprise its use of the same deposition excerpts a second time for "impeachment" purposes. All things considered, JamSports might be better advised to call the witnesses in its case in chief and use the deposition testimony as admissions and as otherwise appropriate during its examination. [2]

2   The Court strongly urges JamSports to carefully think through its strategy. In the Court's experience, the use of a deposition, even a videotaped deposition, tends to take a good deal of the "punch" out of the presentation of evidence, even with regard to an adverse witness, and risks boring the jury.

**[*14] D. JamSports' renewed motion for sanctions and other relief**

The Court initially believed that all lingering issues from in JamSports' renewed motion for sanctions and other relief, which focused on Clear Channel's belated disclosure that it had received from Ticketmaster rebates from supercross event admission tickets sold through that entity, have now been resolved. JamSports' status memorandum, however, suggests this may not be the case. *See* Pl. Mem. Regarding Status of Case at 6-7. JamSports is directed to file, on or before January 6, 2005, a memorandum of no more than three pages identifying with specificity what information it claims has not yet been produced that was encompassed in this motion. Clear Channel is directed to respond to any such claims in a memorandum of no more than three pages, to be filed on or before January 11, 2005.

**E. JamSports' motion for protective order (third party subpoenas)**

Three entities related to JamSports -- Jam Productions, East End Management, and Pacific Management Services -- previously moved to quash subpoenas *duces tecum* served by Clear Channel seeking, among other things, financial information. The subpoenas [*15] were premised on the belief that JamSports had relied on the financial wherewithal of those entities to support its en-

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 18 of 42

Page 5

2005 U.S. Dist. LEXIS 59, *; 2005-1 Trade Cas. (CCH) P74,672

try into the supercross market. But JamSports principal Jerry Mickelson "testified that, in fact, JamSports was not relying upon the financial wherewithal of Jam Productions, East End Management and Pacific Management Services to financially support the JamSports/AMA Supercross series program." Pl. Mem. Regarding Status of Case at 3. Both sides agree that the motion to quash may be terminated as moot.

### F. JamSports' motions *in limine*

#### 1 & 2. Evidence regarding approval by AMA Pro's parent

JamSports sued AMA Pro for breach of contract, asserting two distinct theories of liability. First, JamSports claimed that their November 2001 letter of intent was a binding agreement entitling JamSports to promote AMA Pro's supercross series. The Court granted summary judgment in favor of AMA Pro on that claim, as the letter of intent contemplated a separate promotion agreement which was never concluded.

Second, JamSports claimed that AMA Pro had breached various provisions of the letter of intent that the Court determined were binding. The letter of intent contained [*16] a provision that required AMA Pro to negotiate "exclusively and in good faith" with JamSports for a specified period, prohibited AMA Pro from entering into discussions with third parties, and required the parties to advise each other of offers received. The Court held that JamSports had established as a matter of law that AMA Pro had violated the requirement to advise JamSports of offers it had received from others, but left for jury determination what, if any, damages to award.

The Court denied JamSports' motion for summary judgment on its claim for breach of the good faith provision. JamSports' primary contention was that AMA Pro's insistence that the final deal be approved by its parent entity, the AMA, constituted bad faith in that this was a new condition not contemplated in the letter of intent. The Court found there was a genuine issue regarding whether AMA Pro's actions amounted to bad faith. *JamSports and Entertainment, LLC v. Paradama Productions, Inc., 336 F. Supp. 2d 824, 848 (N.D. Ill. 2004).* The Court ruled that AMA Pro was precluded by the parol evidence rule from arguing that this was understood by both sides at the time of the letter of intent but [*17] reserved for later determination whether AMA Pro could rely on evidence regarding earlier discussions and understandings to show its lack of bad faith. *Id. at 848-49.*

JamSports has now moved *in limine* to exclude all evidence of understandings and discussions about approval by AMA and to bar argument that AMA approval was a condition of any final agreement. The Court agrees with JamSports that AMA Pro cannot contend that approval by AMA was a condition of a final agreement; the Court rejected that argument in the summary judgment ruling. *Id. at 848.* But the Court believes that evidence the parties had discussed the need for AMA Pro to obtain approval by its parent is relevant to show whether AMA Pro engaged in "deliberate misconduct" *See Venture Assocs. Corp. v. Zenith Data Systems Corp., 96 F.3d 275, 279 (7th Cir. 1996).*

JamSports has also moved to bar, as irrelevant, evidence that AMA Pro sought approval by its parent. As just described, this evidence is relevant and admissible on the issue of whether AMA Pro's conduct amounted to bad faith.

#### 3. Evidence that facilities were not "essential"

The Court denies JamSports' [*18] request to prevent Clear Channel's expert, Dennis Carlton, from testifying that the facilities from which Clear Channel allegedly excluded JamSports were not essential and could not have harmed competition, due to the existence of viable alternative venues. Though JamSports' antitrust claims premised on the "essential facilities" doctrine are no longer part of the case, Carlton's testimony is relevant on the remaining antitrust claim, as to the issue of anti-competitive effect.

#### 4. Carlton expert testimony on liability

The Court has previously denied, in a separate order, JamSports' motion to bar Clear Channel's antitrust liability expert Dennis Carlton from testifying. *See* Order of Nov. 22, 2004. However, Clear Channel's request to bar certain testimony by JamSports' liability expert Robert Baade has led the Court to revisit the matter of Carlton's testimony. The parties should consult Section G.2 of this Opinion for further discussion of the point.

#### 5. Affidavits of venue managers

Clear Channel obtained affidavits from stadium managers explaining their relationships with Clear Channel and why JamSports did not obtain access to their venues for its proposed supercross [*19] tour. There is no question that these affidavits are hearsay; Clear Channel does not contend otherwise. But it argues that its expert Carlton should be able to rely on these statements whether or not the witnesses testify at trial. JamSports disagrees and seeks to bar any reference to the statements.

Under *Federal Rule of Evidence 703*, facts or data upon which an expert relies need not be admissible if they are "of a type reasonably relied upon by experts in the particular field informing opinions or inferences upon the subject." *Fed. R. Evid. 703.* JamSports has directly

Case 1:07-cv-06654   Document 36-5   Filed 07/30/2008   Page 19 of 42

Page 6

2005 U.S. Dist. LEXIS 59, *; 2005-1 Trade Cas. (CCH) P74,672

challenged Carlton's reliance on the venue affidavits, arguing that he "should not be permitted to rely on hearsay information not of the type commonly relied upon by experts in the field of economics." JamSports Mots. In Limine at 6. Despite this frontal attack, Clear Channel has provided no basis for a claim that persons in Carlton's field reasonably rely upon otherwise inadmissible hearsay statements of this type whose veracity has not been subjected to testing via cross examination or otherwise. *See* Clear Channel Resp. to JamSports Mots. [*20] In Limine at 5-6. [3] As the proponent of Carlton's testimony, Clear Channel bears the burden of showing its admissibility. *See, e.g., United States v. Hicks, 389 F.3d 514, 525 (5th Cir. 2004); United States v. Frazier, 387 F.3d 1244, 1246 (11th Cir. 2004)*. Because it has failed to carry that burden, Carlton may not base his opinions on the out-of-court statements of the venue managers.

> 3   Clear Channel suggests in passing that the venue managers are "impartial," but that is not necessarily so: they, or at least some of them, have had ongoing business relationships with Clear Channel. But in any event, a claim of impartiality does not substitute for *Rule 703*'s requirement that inadmissible data be of the type reasonably relied upon by experts in the particular field.

## 6. Statements by OEM representatives, industry representatives, and others

JamSports also attacks Carlton's reliance on hearsay statements by representatives of original equipment manufacturers and others in [*21] the supercross business. In response, Clear Channel incorporates its arguments regarding Carlton's use of the out-of-court statements of the venue managers. The Court's ruling is the same as in the previous section.

## 7. "Social contacts" between Mickelson and Becker

Clear Channel does not dispute JamSports' argument that testimony about various contacts between Jerry Mickelson, the principal of JamSports, and Brian Becker, an officer of Clear Channel, at which they discussed trying to resolve the lawsuit should be excluded pursuant to *Federal Rule of Evidence 408*.

## 8. JamSports' efforts to enter the supercross market

The Court denies JamSports' request to bar Clear Channel from offering evidence that JamSports made no further efforts to enter the supercross market after AMA Pro declined to enter into a final promotion agreement. This is not a matter of an unalleged affirmative defense of failure to mitigate damages, as JamSports contends.

Rather, the evidence is, as Clear Channel argues, probative on the question of antitrust injury with regard to what the Court has previously referred to as JamSports' "non-*Fishman* theory" of antitrust [*22] liability. Clear Channel's theory is that JamSports was simply trying to get the AMA Pro contract and step into Clear Channel's shoes, not to compete with Clear Channel in the marketplace. Clear Channel is entitled to introduce evidence that supports its theory.

## 9. Clear Channel's "right to promote supercross"

JamSports asks the Court to bar evidence regarding the long history of Clear Channel and its predecessors in promoting supercross events. JamSports is correct that Clear Channel cannot use the existence of its monopoly of the alleged market to argue that a monopoly is the appropriate way for that market to be structured. But Clear Channel is entitled to present evidence of its skill and experience in order to show, among other things, that it got the AMA Pro contract by merit, not tortious interference with JamSports' deal.

## 10. Redacted documents

Clear Channel says that it has no intention of introducing any redacted documents at trial, so JamSports' request to preclude it from doing so is moot.

## 11. Expert testimony about "free riding"

The Court denies JamSports' motion to preclude Clear Channel from offering expert testimony and other evidence tending [*23] to justify its efforts to obtain from various venues agreements (called "clearances") precluding other similar events in those venues for periods before and after Clear Channel's supercross events. JamSports contends that the opinion of Clear Channel's expert that clearances were legitimate business conduct that was not anticompetitive is unsupported by any evidence. The Court agrees in part and disagrees in part. As discussed later in this Opinion, neither party's expert may properly testify regarding the motivations of the venue managers. But Carlton's testimony that clearances may be justified on legitimate business grounds is proper, for the reasons cited in Clear Channel's response to JamSports' motion. *See* Clear Channel Resp. to JamSports Mots. In Limine at 12-14. The appropriate way for JamSports to attack Carlton's opinion on that point is through cross examination and presentation of contrary evidence.

## 12. Evidence of Clear Channel's general and administrative costs

During discovery, JamSports asked Clear Channel to identify its general and administrative expenses applicable to supercross, for purposes of analysis and use by JamSports' damages expert Stephen Siwek. [*24] In

response, Clear Channel represented that this was not an allocation that it made in the normal course of this business; for purposes of the discovery request, it provided an allocation based on the proportion of its revenues derived from supercross, which amounted to about twenty percent. JamSports maintains that internal Clear Channel records, not prepared for litigation purposes, suggest that this vastly overstates the proportion of general and administrative expenses attributable to supercross.

JamSports wants the Court to bar Clear Channel from using the for-litigation figures for any purpose at trial. The Court denies this request. Clear Channel may present and argue its allocation at trial; this is a factual dispute appropriately evaluated by the jury. JamSports, of course, likewise will be permitted to offer and use in cross-examination its own methodology for how such costs are properly allocated, including the Clear Channel records that it claims undercut Clear Channel's "standalone" figures.

**13. JamSports' supercross expense projections**

As noted in the previous section, Clear Channel claims that it does not routinely allocate its general and administrative expenses [*25] or overhead to particular lines of business such as supercross. JamSports argues that as a result, Clear Channel and its expert should be prevented from arguing that any particular figures in the general and administrative projection developed by JamSports' expert Siwek for purposes of determining lost profits are less than the expenses Clear Channel incurred and thus are artificially low. The Court agrees with Clear Channel that it would be improper to bar an attack on Siwek's figures. If it is true that Clear Channel's own records do not break down such expenses specifically for supercross, then presumably no one -- including Clear Channel's expert or its lawyers -- will have had access to, or will be able to use at trial, internally-used Clear Channel figures that might tend to reflect that particular elements of Siwek's analysis are wrong. If it appears otherwise at trial, the Court assumes JamSports will promptly raise the issue with the Court.

**14. Ticketmaster rebate revenue**

JamSports asks the Court to bar Clear Channel from cross-examining JamSports' damages expert, Stephen Siwek, regarding the fact that his damage analysis does not include ticket rebate revenue that [*26] Clear Channel received from Ticketmaster. Clear Channel, which belatedly produced documentation regarding the Ticketmaster revenue, has affirmed it will not refer to the fact that Siwek's initial analysis did not include that revenue. See Clear Channel Resp. to JamSports Mots. In Limine at 17. The Court will not preclude Clear Channel, however, from cross-examining Siwek regarding the accu-

racy of the figures in his analysis for the Ticketmaster rebate revenue. [4]

> 4    JamSports says that even after the original non-production of the Ticketmaster rebate records became known, Clear Channel still refused to produce complete records in this regard. It argues that it would be unfair for Clear Channel to imply in questioning Siwek or in argument that Siwek's analysis cannot be believed because he is unaware of how the revenues are calculated. Ruling on this point will have to await the Court's final determination of JamSports' renewed motion for sanctions and other relief, see supra at 8-9, which involves the disclosure of the Ticketmaster information.

[*27]  **G. Clear Channel's motions in limine**

**1. Evidence "inconsistent with the Court's ruling on essentiality"**

The Court granted summary judgment in Clear Channel's favor on several antitrust claims that were premised on the so-called essential facilities doctrine, on the ground that JamSports had no evidence from which a jury reasonably could conclude that it was excluded from "essential" facilities as that term is defined in antitrust law. JamSports and Entertainment, 336 F. Supp. 2d at 839. Now Clear Channel seems to say that Count 15, JamSports' remaining antitrust claim, also depends on this theory. See Clear Channel Consol. Mots. In Limine at 2. But that is not what Clear Channel said in its summary judgment motion; then it said that "four of Jam's five remaining antitrust claims -- Counts 5, 6, 8 and 12 -- arise under the 'essential facilities' doctrine." Mem. in Support of Clear Channel Defs' Mot. for Summ. Judg. at 8 (footnote omitted). Much later, in discussing Count 15, Clear Channel made an in-passing reference to the point, saying, without elaboration or support, that JamSports' "complaint that Clear Channel strong-armed the stadiums [*28] into refusing access... [is] a repeat of the essential-facilities claim, and must be rejected for the same reasons." Id. at 30. But that was not sufficient to advance the argument as a basis for summary judgment, [5] and thus to the extent Clear Channel is trying to press such an argument now, it comes too late in the day for summary judgment purposes. The Court agrees with JamSports that the evidence regarding Clear Channel's allegedly exclusionary behavior with regard to stadium venues is relevant to JamSports' monopolization claim in Count 15; in effect the Court held just that in denying summary judgment on this claim. See JamSports and Entertainment, 336 F. Supp. 2d at 843-45. There is, accordingly, no basis to preclude JamSports from offering evidence concerning that behavior -- even if the stadiums were not

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 21 of 42

Page 8

2005 U.S. Dist. LEXIS 59, *; 2005-1 Trade Cas. (CCH) P74,672

"essential" within the meaning of the essential facilities doctrine.

> 5   The Court also notes that our ruling made it clear we perceived Clear Channel's arguments about the deficiencies in JamSports' essential facilities claims to address only the claims other than Count 15. *See JamSports and Entertainment, 336 F. Supp. 2d at 837* ("Counts 5, 6 and 12 ... are based on the essential facilities doctrine"). Clear Channel did not seek reconsideration on the ground that the Court had overlooked application of these same arguments to Count 15.

[*29] **2. Issues regarding testimony of plaintiff's liability expert**

Clear Channel asks the Court to address several issues in its previously-filed motion to exclude the testimony of JamSports' liability expert, Robert Baade, that the Court was not required to address in dealing with Clear Channel's motion for summary judgment.

First, because the Court has granted summary judgment in Clear Channel's favor on JamSports' antitrust claims that were premised on the essential facilities doctrine, Clear Channel's request to bar Baade's testimony concerning the "essentiality" of facilities is moot.

Second, there is no basis to bar Baade from testifying regarding the significance of the facilities that Clear Channel allegedly sought to make unavailable to JamSports. First, the Court does not regard this as an attempt to circumvent the Court's ruling dismissing JamSports' essential facilities claims. Second, although Baade's report focuses primarily on the issue of "essentiality," his opinions regarding the significance of various facilities, which were explored at length during his deposition, are fairly encompassed within that discussion and thus are not subject to exclusion on the ground [*30] they were undisclosed. Third, Clear Channel's contention that Baade's reasoning was circular is a matter to be explored by cross-examination and presentation of contrary evidence; it is not a basis for excluding the testimony. The Court has reviewed Baade's report and finds that it adequately explains, based on application of his expertise, the rationale for his conclusions in this regard.

Clear Channel also attacks Baade's methodology for determining that certain conduct was anticompetitive. In this regard, the Court largely agrees with Clear Channel. The Court has carefully reviewed Baade's report submitted pursuant to *Rule 26(a)(2)*, as well as the excerpts cited by the parties from his two-day deposition. Baade's discussion of the question of anticompetitive conduct consists, in large part, of his interpretation of correspondence and other evidence. *See Baade Report at 46-52.*

JamSports has failed to persuade the Court that this is proper testimony by an expert in economics. There is nothing in Baade's expertise that suggests that he is any more competent than the average juror in interpreting these communications or in divining from them the intent of Clear Channel and others. [*31] Such insights, as Judge Easterbrook noted in a similar context, "are no part of the economist's armamentarium." *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago, 877 F.2d 1333, 1340 (7th Cir. 1989).* In conducting this analysis, Baade has simply "examined materials produced in discovery and [drawn] inferences from the record." *Id.* Such testimony, in this context at least, does not constitute the application of "scientific, technical, or other specialized knowledge [that] will assist the trier of fact." *Fed. R. Evid. 702. See also, City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 565, 567 n.27 (11th Cir. 1998)* (barring testimony of economist that amounted to "characterization of documentary evidence as reflective of collusion" and "characterization[s] of particular bids as 'signals'" on the grounds that "the trier of fact is entirely capable of determining whether or not to draw such conclusions without any technical assistance").

Interspersed among Baade's inferences from the documentary evidence on the issue of anticompetitive conduct, one finds statements that, at least on their face, [*32] appear to have a grounding in economics and a relationship to Baade's expertise. For example, Baade finds that Clear Channel's alleged exclusionary behavior with regard to stadium venues "lessened competition to the detriment of consumers" and others, Baade Report at 52, and that its conduct with regard to the Dorna contract "impairs the well being of consumers" and others, *id.* at 54. His analysis of the economic implications of Clear Channel's proposals to original equipment manufacturers likewise appears to properly apply his expertise in a manner helpful to the finder of fact. *Id.* at 55. And there are likely other points under the heading of anticompetitive conduct to which Baade properly can testify. Sorting of the admissible from the inadmissible will require further discussion.

The Court also notes that Clear Channel's attack on Baade's testimony in this regard is not altogether different from an earlier attack by JamSports on testimony by Clear Channel's expert, Dennis Carlton, which the Court previously rejected. Having now re-reviewed Carlton's report in light of our rulings regarding Baade, the Court notes that that report, like Baade's, incorporates findings that [*33] consist of little more than the interpretation of written or verbal statements by others. *See, e.g.,* Carlton Liability Report PP 69, 78-80. Such "findings," like those of Baade discussed above, are not an appropriate subject for expert testimony. Carlton, like Baade, will be barred from rendering opinions that amount to simply

2005 U.S. Dist. LEXIS 59, *; 2005-1 Trade Cas. (CCH) P74,672

interpreting the evidence and drawing inferences regarding the motivation of Clear Channel or others.

### 3. Argument regarding lack of justification for "clearances"

Clear Channel wants the Court to bar JamSports from arguing that there was no legitimate business reason for Clear Channel's alleged practice of insisting that venues provide spacing or "clearance" periods between similar events, as a JamSports representative who appeared for a *Rule 30(b)(6)* deposition said the practice could be justified. The Court agrees with JamSports that the relevant issue for purposes of antitrust liability is whether Clear Channel actually engaged in the challenged conduct for legitimate reasons, not whether, after the fact, the conduct can, in hindsight, be rationalized in some way. *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985)*; [*34] *LePage's, Inc. v. 3M, 324 F.3d 141, 163-64 (3d Cir. 2003) (en banc)*. The testimony by JamSports' representative is not a basis to preclude JamSports from attacking the motivation for Clear Channel's conduct. Clear Channel's request is denied.

### 4. "Changed testimony" regarding the relevant market

Clear Channel argues that because one or more JamSports representatives testified that what the company was interested in obtaining was the AMA Pro supercross contract that Clear Channel previously had, JamSports should be precluded from arguing that the relevant market is supercross generally. The motion is denied. As JamSports notes in its response, it is not at all clear that there is any inconsistency. That aside, the appropriate way for Clear Channel to deal with any apparent contradictions is to draw attention to them in cross examination and closing argument. There is no proper basis to confine JamSports to a particular relevant market based on the referenced deposition testimony.

### 5. "Contradiction" between relevant market and preparedness to enter market

To establish its antitrust claim, JamSports must, among other things, define the relevant market, [*35] and must, because its claim is one of market exclusion, show that it was prepared to enter that market. Clear Channel says that JamSports appears to rely on its experience in promoting music concerts as part of its showing of preparedness. It contends that this is inconsistent with JamSports' contention that the relevant market is the market for promoting supercross and thus seeks to preclude JamSports from arguing that is the relevant market. This is not a proper basis for limiting JamSports' legal theory at trial. If there is an inconsistency (the Court does not see that any necessarily exists), the way for Clear

Channel to deal with it is by drawing attention to it in cross examination, if appropriate, and in closing argument.

### 6. Evidence of Clear Channel's profits

Clear Channel asks the Court to prevent JamSports from arguing that Clear Channel's profit level tends to show that it had monopoly power. Clear Channel's profits are admissible, if for no other reason, on the issue of damages and thus will be part of the evidence admitted at trial. The appropriate inferences to be drawn from the evidence should be addressed in a *Rule 50* motion (if appropriate) and /or prior to [*36] closing argument. Clear Channel also says the Court should "preclude Jam[Sports] from presenting evidence" that Clear Channel's profits show it had monopoly power, *see* Clear Channel Consol. Mots. In Limine at 10; *see also id.* at 11, but because it identifies no particular evidence, the request is denied.

### 7 - 11. Contentions that certain conduct by Clear Channel was "anticompetitive"

In sections seven through eleven of its motion *in limine,* Clear Channel argues that JamSports should be barred from characterizing certain evidence -- Clear Channel's press releases, its dealings with original equipment manufacturers, the Federation Internationale de Motocyclisme and Dorna, and Speed Channel, and its use of leverage derived from other markets -- in certain ways. Clear Channel has not asked the Court to bar any of this evidence; it asks to preclude only JamSports' "contentions" regarding the evidence.

These are not proper motions *in limine.* [6] It remains to be seen what characterizations reasonably and properly can be made of the evidence that will be admitted at trial. The jury will be advised that the lawyers' opening statements are not evidence and can, like [*37] other juries, be expected to abide by this instruction. It will be more appropriate to address the propriety of any particular characterization of the evidence by way of a motion pursuant to *Federal Rule of Civil Procedure 50* or a motion *in limine* prior to closing arguments. Clear Channel's requests to preempt JamSports' characterization of this evidence are denied.

> 6   In addressing the parties' summary judgment motions, the Court was not required to address the legitimacy of the particular business tactics of Clear Channel that are the subject of these *in limine* requests. The Court stated in a footnote that if Clear Channel "wishes to seek an order excluding [these] matters at trial," it should do so by way of a motion *in limine. JamSports and Entertainment, 336 F. Supp. 2d at 845 n. 9*. What the

Case 1:07-cv-06654   Document 36-5   Filed 07/30/2008   Page 23 of 42

Page 10

2005 U.S. Dist. LEXIS 59, *; 2005-1 Trade Cas. (CCH) P74,672

Court was inviting was a motion to exclude evidence if proper grounds existed. But Clear Channel has not moved to exclude the evidence in question. Rather, as noted in the text, it seeks only to prevent certain characterizations of the evidence.

[*38] **12. Actions not directed at AMA Pro - tortious interference claim**

Clear Channel asks the Court to preclude JamSports from arguing that Clear Channel's actions directed at entities other than AMA Pro -- i.e., actions directed at stadium venues constituted tortious interference with JamSports' contractual expectations with AMA Pro. The request is premature and is denied for that reason. The evidence regarding Clear Channel's contacts with the venues is relevant and admissible, if for no other reason, on JamSports' antitrust claim. It is more appropriate to address at a later time (either in the context of a *Rule 50* motion or a motion *in limine* prior to closing argument) whether this evidence may be used to support JamSports' tortious interference claims.

**13. Argument that Clear Channel could not contact AMA**

Evidence of Clear Channel's contacts with AMA Pro's parent, the AMA, is plainly relevant to the claims of breach of contract and tortious interference. Clear Channel does not ask the Court to bar this evidence; it seeks only to preclude argument that Clear Channel was prohibited from contacting the AMA. As the Court reads Clear Channel's argument, it sounds more [*39] like a request for summary judgment than a motion *in limine. See* Clear Channel Consol. Mots. In Limine at 18-19 ("Absent proof that (a) such a restriction existed, and (b) that Clear Channel knew of it, such contacts cannot as a matter of law constitute tortious interference with AMA Pro's deal with Jam"). The request should be presented, assuming appropriate grounds exist, as part of a *Rule 50* motion. The motion *in limine* is denied.

**14. Argument that Clear Channel's actions led to requirement of AMA approval**

Clear Channel asks the Court to prevent JamSports from arguing that final approval of its promotion agreement by AMA was a condition imposed as a result of action by Clear Channel, on the grounds that "there is absolutely no evidence whatsoever supporting that contention." Clear Channel Consol. Mots. In Limine at 19. Clear Channel does not seek to preclude any evidence; its request, like the one discussed in the preceding section, amounts to a renewed motion for summary judgment on the tortious interference claims, or, as Clear Channel itself describes it, a request for reconsideration of the Court's ruling denying summary judgment on

those claims. *Id.* The [*40] motion is denied without prejudice to its presentation as a motion under *Rule 50.*

**15. Investigations and other cases**

Because JamSports has stated that it does not intend to offer evidence regarding a Department of Justice inquiry regarding the present matter or regarding other antitrust suits against Clear Channel, Clear Channel's request to bar this evidence is moot.

**16. "Log" prepared by Jerry Mickelson**

JamSports' principal Jerry Mickelson prepared a diary of his contacts with various stadiums and their managers between November 2001 and March 2002. This was after JamSports had already engaged antitrust counsel. The diary includes copies of written communications Mickelson sent to the venues, and also provides his versions of conversations he had with venue managers. Clear Channel argues that the diary should be excluded as hearsay.

JamSports does not dispute the proposition that the diary is hearsay [7] but argues that it is admissible under one of two exceptions: as past recollection recorded under *Rule 803(5)*, or as a record of regularly conducted activity under *Federal Rule of Evidence 803(6)* -- the so-called "business record" [*41] exception. *Rule 803(5)* does not support admission of the diary. That Rule does not permit introduction of the document itself; it states that "if admitted, the memorandum ... may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party." *Fed. R. Evid. 803(5)*. But that aside, *Rule 803(5)* does not authorize admission of Mickelson's written version of his conversations with the venue managers; the oral out-of-court statements are a separate level of hearsay which requires their own basis for admissibility. *See, e.g., Bularz v. Prudential Ins. Co. of America, 93 F.3d 372, 377-78 (7th Cir. 1996); Fed. R. Evid. 805* (hearsay within hearsay is not excluded "if each part of the combined statements conforms with an exception to the hearsay rule").

> 7   It is conceivable that the e-mail communications that are incorporated into the diary may be admissible on some basis. Our discussion focuses on the diary's rendition of Mickelson's conversations with venue managers.

[*42] *Rule 803(6)* likewise does not authorize admission of Mickelson's diary. That Rule requires a showing that the information contained in the record at issue was "'transmitted by' a declarant 'with knowledge' in the ordinary course 'of a regularly conducted business activity'" and thus encompasses only declarants "'who report to the recordkeeper as part of a regular business routine in which they are participants.'" *Cook v. Hoppin, 783*

2005 U.S. Dist. LEXIS 59, *; 2005-1 Trade Cas. (CCH) P74,672

F.2d 684, 689 (7th Cir. 1986) (quoting *Fed. R. Evid. 803(6)* and *Petrocelli v. Gallison, 679 F.2d 286, 290 (1st Cir. 1982)).* "The fact that statements made by strangers to the business become a part of its records ... does not make [those statements] business records unless they are verified by the business and thus adopted and become the business's own statements," *United States v. Santos, 201 F.3d 953, 963 (7th Cir. 2000),* which is not the case here. *See also, e.g., United States v. Ismoila, 100 F.3d 380, 392 (5th Cir. 1996).* Moreover, the business record rule does not authorize the admission of documents prepared in anticipation of litigation, *United States v. Blackburn, 992 F.2d 666, 670 (7th Cir. 1993),* [*43] as the circumstances suggest was the case regarding Mickelson's diary.

It is conceivable, as JamSports notes, that one or more venue managers may testify inconsistently with Mickelson's recollection of their statements to him. If so, and the proper foundation is laid, Mickelson will be able to recount the prior inconsistent statements to impeach these witnesses, and if necessary the diary can be used to refresh his recollection. And if Mickelson's rendition of the venue managers' prior statements becomes otherwise admissible, the diary may at that point fall within *Rule 803(5)'s* hearsay exception for recorded recollections. Finally, as JamSports notes, it is possible to imagine circumstances under which portions of the diary may become admissible as prior consistent statements. *See Fed. R. Evid. 801(d)(1)(B).* But Mickelson's diary is otherwise not properly admissible under any exception to the hearsay rule.

### 17. Argument that Clear Channel interfered with potential investors

Clear Channel contends there will be no evidence supporting a claim that it interfered with or even communicated with any of JamSports' potential investors and asks [*44] the Court to preclude JamSports from making any such argument. The motion is unnecessary and is therefore denied. The Court believes it can safely assume that counsel will not make claims in opening statement that they have no basis to believe will be supported by the evidence; in any event, the jury will be instructed that counsel's statements are not evidence.

### 18. Reliance on financial wherewithal of various investors

Clear Channel requests that the Court bar JamSports from claiming that, to enter the supercross business, it was relying on the financial wherewithal of persons -- specifically, certain principals of JamSports itself -- whose financial information JamSports resisted producing in discovery. In response, JamSports says that "the undisputed evidence at trial will show that JamSports *never had to rely upon its principals' financial assets* to

support its business" due to commitments from others. JamSports Resp. to Clear Channel's Consol. Mots. In Limine at 23 (emphasis added). Clear Channel's motion thus appears to be moot.

### 19. Hearsay testimony regarding commitments from investors

Because JamSports has committed that it will not offer hearsay testimony [*45] from Mickelson regarding commitments he claims to have received from potential investors, JamSports Resp. to Clear Channel's Consol. Mots. In Limine at 24, Clear Channel's request to bar such testimony is moot.

### 20. JamSports Exhibit 65

Clear Channel moves to exclude JamSports Exhibit 65, a draft letter from Eric Cole, a Clear Channel representative, to a representative of Reliant Stadium. Clear Channel argues, and JamSports does not dispute, that the letter was never sent by Cole, and thus the letter is inadmissible in and of itself. If, as JamSports contends, it can show that the letter accurately summarizes a telephone conversation between Cole and the stadium representative that is otherwise admissible against Clear Channel under *Rule 801(d),* the part of the letter that constitutes such a summary might be admissible under, and in the manner provided by, *Federal Rule of Evidence 803(5).* Final determination will have to await the necessary foundation.

### 21. Sums allegedly spent trying to enter the supercross business

Clear Channel contends that a significant portion of the expenses JamSports claims it incurred in trying to enter into [*46] the supercross business were in fact expenses it incurred to pursue the present suit and are therefore inadmissible with regard to any matter to be determined by the jury. But JamSports contends that it can show these expenses had nothing to do with this lawsuit. Based on the sketchy information provided by the parties, there is no basis to preclude any particular evidence. But JamSports' reference in its response to "certain legal expenses incurred by JamSports which were incurred as a result of Clear Channel's anti-competitive conduct with supercross venues ... before AMA Pro Racing reneged," JamSports Resp. to Clear Channel's Consol. Mots. In Limine at 25, is ambiguous enough to require further consideration of that particular point before the evidence is offered at trial. The Court will leave it to the parties to raise the issue at some appropriate point during the trial.

### 22. JamSports Exhibit 584

Clear Channel moves to exclude JamSports Exhibit 584, an e-mail that Clear Channel claims is protected by

2005 U.S. Dist. LEXIS 59, *; 2005-1 Trade Cas. (CCH) P74,672

the attorney-client privilege. Clear Channel has failed to make the necessary showing, as the e-mail does not appear to be a communication for the purpose of obtaining legal [*47] advice. In addition, Clear Channel allowed Eric Cole, the author of the e-mail, to be questioned about its contents without objection. *See* JamSports Resp. to Clear Channel Mots. In Limine at 26 (quoting deposition testimony). Thus if nothing else, the privilege has been waived. The Court also rejects Clear Channel's argument that the e-mail should be excluded under *Federal Rule of Evidence 403*; the e-mail is probative of Clear Channel's intent, and it has identified no *unfair* prejudice that would result from its admission.

### 23. JamSports Exhibits 11 and 152

Clear Channel seeks to exclude two documents that, according to JamSports, reflect plans or efforts by Clear Channel to leverage its power over venues to prevent them from giving access to competitors in areas other than supercross. Clear Channel argues that this is inadmissible "propensity" evidence. JamSports argues that the evidence is probative of motive, intent, and plan and is thus admissible under *Federal Rule of Evidence 404(b)*. The Court needs to hear more argument before it

can rule on this issue and thus defers determination of the point [*48] until the final pretrial conference or trial.

### Conclusion

For the reasons stated above, the motion of certain non-parties to quash subpoenas [187-1] is terminated. Defendant's motion to quash subpoena or for protective order [230-1 & 2] is granted. Defendant's objection to the use of videotaped testimony is overruled. Plaintiff's motion *in limine* [235-1 through 235-14] and defendants' motion *in limine* [245-1] are granted in part and denied in part as detailed above. Defendant's motion to clarify the final pretrial order [258-1] has been ruled upon and is therefore terminated. The case is held for trial on February 7, 2005 at 9:45 a.m. A continued pretrial conference is set for January 20, 2005 at 10:00 a.m. Telephone conference, to be initiated by the parties, is set for January 10, 2005 at 9:00 a.m. to discuss the agenda for January 20.

MATTHEW F. KENNELLY

United States District Judge

Date: January 3, 2005

LEXSEE 187 FRD 578



Caution
As of: Jul 30, 2008

**Archer Daniels Midland Company, Plaintiff, vs. Aon Risk Services, Inc. of Minnesota, formerly d/b/a Rollins Hudig Hall of Minnesota, Inc., formerly d/b/a Rollins Burdick Hunter of Minnesota, Inc., Defendant.**

**Civ. No. 97-2185 (JRT/RLE)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*187 F.R.D. 578; 1999 U.S. Dist. LEXIS 11718*

**June 7, 1999, Decided**

**SUBSEQUENT HISTORY:** Motion for new trial denied by, Stay denied by, Motion denied by, Motion granted by, Judgment entered by *Archer Daniels Midland Co. v. Aon Risk Servs., 2002 U.S. Dist. LEXIS 19314 (D. Minn., Sept. 27, 2002)*

**PRIOR HISTORY:** *Midland v. Aon Risk Servs., Inc., 1999 U.S. Dist. LEXIS 23527 (D. Minn., Feb. 25, 1999) Archer-Daniels-Midland Co. v. Phoenix Assur. Co., 975 F. Supp. 1129, 975 F. Supp. 1137, 1997 U.S. Dist. LEXIS 12398 (S.D. Ill., 1997)*

**DISPOSITION:** [**1] Defendant's Motion to Amend Pretrial Order [Docket No. 68, pt. 1] GRANTED in part. Defendant's Motion to Amend its Answer [Docket No. 68, pt. 2] DENIED. Defendant's Motion to Compel Depositions [Docket No. 68, pt. 3] DENIED. Plaintiff's Motion for Protective Order [Docket No. 73] GRANTED in part.

**COUNSEL:** For plaintiff: Kara L Benson, Jerry W Snider, Faegre & Benson, Mpls, MN.

For movant: John M Bray, Kevin M Dinan, Robert W Fleishman, James T Pahlen, Monica L Selter, John D Shakow, Not Admitted.

For plaintiff: Aubrey M Daniel, III, William D Langford, Jr, Philip A Sechler, Williams & Connelly, Washington, DC.

For plaintiff: Thad A Davis, UNKNOWN.

For defendant: C Eric Hawes, Larkin Hoffman Daly & Lindgren, Bloomington, MN.

For defendant: Eliot R Hudson, Shand S Stephens, Aon Corp, San Francisco, CA.

For defendant: Alan L Kildow, Larkin Hoffman Daly & Lindgren, Bloomington, MN.

For movant: Bruce L McLellan, Mark Bradley Peterson, Plunkett Schwartz Peterson, Mpls, MN.

For defendant: Watson B Tucker, Tucker Law Office, Chicago, IL.

**JUDGES:** Raymond L. Erickson, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Raymond L. Erickson

**OPINION**

[*579] MEMORANDUM ORDER

At Duluth, [**2] in the District of Minnesota, this 7th day of June, 1999.

I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to [*580] a general assignment, made in accordance with the provisions of Title *28 U.S.C. § 636(b)(1)(A)*, upon the Defendant's

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 27 of 42

Page 2

187 F.R.D. 578, *; 1999 U.S. Dist. LEXIS 11718, **

Motion to Amend Pretrial Order, Amend its Answer, and Compel Depositions, and upon the Plaintiff's Motion for a Protective Order. A Hearing on the Motion was conducted on May 11, 1999, at which the Plaintiff appeared by Jerry W. Snider, Kara L. Benson, William D. Langford Jr., and Aubrey M. Daniel, III, Esqs.; and the Defendant appeared by Alan L. Kildow, Shand S. Stephens, and Eliot R. Hudson, Esqs. For reasons which follow, the Defendant's Motion to Amend the Pretrial Order is granted in part, its Motions to Amend its Answer and to Compel Depositions are denied, and the Plaintiff's Motion for a Protective Order is granted in part.

## II. Factual and Procedural Background

This case arises out of the "great" flood of 1993, which inundated vast areas of the Mississippi River basin. The Plaintiff Archer Daniels Midland Company ("ADM"), whose business is said to have been substantially [**3] harmed by the flood's effect upon corn production, barge traffic, and by the other devastating consequences of the deluge, claims that the Defendant Aon Risk Services, Inc. ("Aon") had neglected to secure $ 50 million, in excess insurance coverage, for ADM's consequent business interruption. More precisely, according to ADM, Aon did not obtain an excess policy from Hartford Fire Insurance Company ("Hartford"), which would have provided "extra expense, contingent business interruption, or contingent extra expense coverage," Am. Compl. P 31, which, assertedly, would have indemnified ADM for losses resulting from the interruption of its business operations.

Before this action was filed, ADM sued its several insurers, including Hartford, in order to recover the policy limits under each insurance contract, for the losses which were claimed to have been sustained as a result of the flood. See, Archer-Daniels-Midland Co. v. Phoenix Assurance Co. ("Phoenix"), 936 F. Supp. 534, Civ. No. 95-4001 (JLF)(S.D. Ill.). There, the District Court dismissed ADM's claims against Hartford, and ADM has taken an appeal to the United States Court of Appeals for the Seventh Circuit, which is still pending.

ADM filed [**4] this action on September 25, 1997, and amended its Complaint on March 11, 1998. After receiving the recommendations of the parties as to appropriate pretrial deadlines, the Court issued its Pretrial Schedule on April 28, 1998. Among the deadlines established by that Order, the time for amending a pleading would expire on July 1, 1998, the discovery period was scheduled to conclude on February 1, 1999, and the case was set to be "Ready for Trial" on July 1, 1999. In addition, each party was limited to 20 depositions and 25 interrogatories. On June 1, 1998, Aon filed a Motion to Dismiss the Plaintiff's Complaint for failing to state a

claim upon which relief could be granted, and the resultant briefing of that Motion ensued.

During the pendency of Aon's Motion to Dismiss, Aon twice moved to amend the Pretrial Schedule by extending certain of its deadlines. We denied the first Motion, but agreed, on January 25, 1999, to permit an extension of the pretrial deadlines, leaving it to the parties to stipulate, in the first instance, to an Amended Pretrial Order which would incorporate a modest extension in the prescribed pretrial timetable. As it had been stipulated by the parties, and accepted [**5] by the Court, discovery is now set to conclude on July 15, 1999, nondispositive Motions are due on October 1, 1999, dispositive Motions must be filed and heard by December 15, 1999, and the case will be "Ready for Trial" on February 1, 2000. Notably, no change in the deadline for amending a pleading was requested, or granted. On February 25, 1999, the District Court denied Aon's Motion to Dismiss and, on March 8, 1999, Aon filed its Answer in this matter.

Candidly admitting that it has only recently given discovery its close attention, Aon requests sweeping modifications to the Pretrial Schedule so as to permit Aon to amend its Answer, in order to assert ten additional affirmative defenses -- many of which overlap, and some of which are premised upon allegations that ADM has engaged in price-fixing in violation of State and Federal Antitrust laws. The proposed affirmative defenses include the following: (1) ADM's unclean hands and/or illegal conduct; (2) ADM's [*581] breach of the insurance contract it had with Hartford by not disclosing facts material to Hartford's decision to underwrite the policy; (3) ADM's misrepresentations to Hartford and Aon; (4) the doctrine of impossibility, assertedly [**6] because the coverage claimed was not available (presumably because of ADM's alleged price fixing); (5) ADM's negligent failure to inform Aon that it did not agree to the terms of the Hartford policy; (6) waiver; (7) laches; (8) promissory estoppel, equitable estoppel, collateral estoppel, and/or judicial estoppel; (9) comparative negligence; and (10) ripeness -- owing to the fact that the dispute between ADM and Hartford has not been finally resolved. Proposed Am. Answer P 63-72. In addition, Aon requests that the Pretrial Order be amended so as to extend each of the remaining pretrial deadlines by six months, and in order to allow Aon to complete 75 depositions, and to serve a total of 50 interrogatories. Aon's Motion to Compel relates to the appropriate location for the depositions of ADM's officers, directors, representatives, and employees. Specifically, Aon seeks an Order that would require ADM to present the deponents, who are within ADM's control, to the District of Minnesota for the taking of their depositions.

ADM's Motion for a Protective Order presents, in practical effect, the mirror-image of Aon's demand for

relief. Pursuant to *Rule 26(c), Federal Rules of Civil Procedure*, [**7] ADM requests an Order that would bar Aon from inquiring into ADM's alleged violations of the antitrust laws, that would preserve the quantity of depositions, and interrogatories, that were allowed in our Pretrial Order, and that would prevent its directors, officers, and employees, from being deposed anywhere else but Decatur, Illinois. This matter was taken under advisement on May 19, 1999, following the parties' submission of additional letter briefs which were intended to clarify their respective positions on certain of the issues presented.

III. *Discussion*

A. *Amendment of the Answer and Pretrial Deadlines*. Aon's attempt to amend its Answer, and to extend the existing pretrial deadlines, has been advanced under the governing regime of *Rules 15(a)*, and *16(b), Federal Rules of Civil Procedure*, which control the amendment of pleadings and the modification of a Pretrial Scheduling Order. In reality, where, as here, the time for amending the pleadings expired some ten months before the Hearing on the Motion to Amend, both requests should be considered within the framework of *Rule 16(b)*. See, *Luigino's, Inc. v. Pezrow Cos., 178 F.R.D. 523, 525 (D. Minn. 1998)*. [**8] [1]

> 1  Aon disputes the timeliness of its Motion to amend its Answer, and our Scheduling Order, and argues that, under Rule 12(a)(3), its Answer was not due until 10 days after the District Court's ruled, on February 25, 1999, on its Motion to Dismiss and, arguing that its Motion to Amend is a nondispositive Motion, Aon notes that it has until October 1, 1999, in which to serve and file such Motions. We can readily accept Aon's first proposition -- that its Answer was not due until March of 1999 -- but we find no merit in its suggestion that the pendency of the Motion to Dismiss afforded an extension in any of the other pretrial deadlines.
>
> This case was not stayed during the pendency of the Motion to Dismiss, and Aon was obligated to either comply with the existing pretrial deadlines, or seek leave to amend them. Indeed, for good cause shown, the Pretrial Schedule was once extended, but the deadline for amending the pleadings was not requested to be altered. As for Aon's second point -- that its Motion to Amend should be governed by the nondispositive Motion date -- the argument is sophistry. Our initial Pretrial Order set separate dates for the filing of Motions to amend the pleadings, and for any other nondispositive Motions. The deadline relating to

Motions to Amend would be nonsensical if such Motions were governed by the more general deadline for nondispositive Motions. Had Aon, or ADM, been interested in a modification of the deadline by which they were required to seek leave to amend their respective pleadings, they could have made that intention known when we previously modified certain of the other pretrial deadlines, upon the parties' proper showing of good cause to do so.

[**9] 1. *Standard of Review. Rule 16(b), Federal Rules of Civil Procedure*, provides that a Scheduling Order "shall not be modified except upon a showing of good cause and by leave of the district judge or, when authorized by local rule, by a magistrate judge." The "good cause" standard is an exacting one, for it demands a demonstration that the existing schedule "cannot reasonably be met despite the diligence of the [*582] party seeking the extension." *Rule 16(b), Federal Rules of Civil Procedure, Advisory Committee Notes - 1983 Amendment*; see also, *Julian v. Equifax Check Services, Inc., 178 F.R.D. 10, 16 (D. Conn. 1998)*. It hardly bears mention, therefore, that "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992)*. Nor does the question of good cause turn on the existence or absence of prejudice to the non-moving party. *Luigino's, Inc. v. Pezrow Cos., 178 F.R.D. at 525*.

In sum, *Rule 16(b)* assures that "[a] magistrate judge's scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly [**10] disregarded by counsel without peril." *Gestetner Corp. v. Case Equip. Co., 108 F.R.D. 138, 141 (D. Me. 1985)*. As unwieldy caseloads, and congested Court calendars, continue to plague the practical utility of Federal Court litigation, "scheduling orders have become increasingly critical to the district court's case management responsibilities," *Luigino's, Inc. v. Pezrow Cos., 178 F.R.D. at 525*, and the capacity of such Orders to sensibly advance litigation to the point of Trial must be responsibly preserved. The accessibility of the Courts would have no particular societal benefit if the actions so filed were not able to be timely brought to Trial. This fundamental truth, clearly articulated in *Rule 1, Federal Rules of Civil Procedure*, underscores the focus of *Rule 16(b)* on the diligence of the party seeking to modify a Scheduling Order, as opposed to the litany of lame excuses, inclusive of inadvertence and neglect, which commonly undergird an untimely Motion to Amend. See, *Sosa v. Airprint Systems, Inc., 133 F.3d 1417, 1418-19 (10th Cir. 1998)*; *Johnson v. Mammoth Recreations, 975 F.2d at 609*.

2. *Legal Analysis*. With [**11] the foregoing as our guide, we consider Aon's proposed modifications of the

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 29 of 42

Page 4

187 F.R.D. 578, *; 1999 U.S. Dist. LEXIS 11718, **

pretrial deadlines and, since they involve somewhat different considerations, we address Aon's request to amend its Answer separately from its request to alter other deadlines in the current Scheduling Order.

a. *Amendment of the Pleadings.* As a prelude to our consideration of Aon's proffered "good cause," for its failure to incorporate its newly formulated affirmative defenses in its recently filed Answer to ADM's Complaint, we first consider Aon's argument that, contrary to the *Rule 16(b)* standard, its delay in amending its pleadings should be viewed under an "absence of prejudice to the nonmovant" criterion. Aon urges that, under the liberal amendment standard which is embodied in *Rule 15(a), Federal Rules of Civil Procedure*, and which counsels that leave to amend should be "freely given," its delay in seeking to amend is not a proper ground to deny such leave so long as no "prejudice" befalls ADM.

Applying the Supreme Court's *Rule 15(a)* standard, see, *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*, the Eighth Circuit has held, on several occasions, that delay, [**12] alone, is an insufficient justification to deny a Motion to Amend, since prejudice to the nonmoving party must also be shown. *Bell v. Allstate Life Ins. Co., 160 F.3d 452, 454 (8th Cir. 1998); Buder v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 644 F.2d 690, 694 (8th Cir. 1981); Mercantile Trust Co. Nat'l Ass'n v. Inland Marine Prods. Corp., 542 F.2d 1010, 1012 (8th Cir. 1976); Hanson v. Hunt Oil Co., 398 F.2d 578, 582 (8th Cir. 1968).* None of these decisions refer to *Rule 16(b)*, and all but one were decided before *Rule 16* was amended to impose a "good cause" prerequisite to an allowable modification of a Pretrial Scheduling Order.

In *Bell* -- the only contemporaneous case -- the Court did rely upon the more relaxed *Rule 15(a)* standard, and applied this standard when the plaintiff filed her Motion four days after the Motion cutoff date, thereby running afoul, at least ostensibly, of *Rule 16(b)*. *Bell v. Allstate Life Ins. Co., 160 F.3d at 454.* The Court affirmed the District Court's refusal to allow the amendment because, as here, the amendment would have raised new factual and legal issues, which [**13] would necessitate additional discovery. As we have noted, however, the Court did not advert to, let alone address, the provisions of *Rule 16(b)*, which require a showing of "good cause" [*583] before a Motion to Amend may be granted, when that grant would violate a *Rule 16* Scheduling Order.

While we are properly constrained to adhere to the directives of our Court of Appeals, we conclude that the holding in *Bell* does not control our analysis here. Under venerable authority, a prior decision will not constitute binding precedent as to issues which were not addressed in that decision, but which were passed upon *sub silentio*. See, e.g., *Waters v. Churchill, 511 U.S. 661, 678, 128 L. Ed. 2d 686, 114 S. Ct. 1878 (1994)*("cases cannot be read as foreclosing arguments they never dealt with."); *Will v. Michigan Dept. of State Police, 491 U.S. 58, 63 n. 4, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989)*("This Court has never considered itself bound [by prior *sub silentio* holdings] when a subsequent case finally brings the * * * issue before us.")[citation and internal quotation marks omitted]; *Webster v. Fall, 266 U.S. 507, 510, 69 L. Ed. 411, 45 S. Ct. 148 (1925)* [**14] ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon are not to be considered as having been so decided as to constitute precedents.").

This principle carries particular sway where, as here, it would be difficult to conceive that our Court of Appeals would slight the clear language of *Rule 16*, as well as a body of case authority, which has been embraced by District Courts within this Circuit, and by other Courts of Appeals -- at least without clearly expressing an intent to do so. See, *Sosa v. Airprint Systems, Inc., 133 F.3d at 1419* ("If we considered only *Rule 15(a)* without regard to *Rule 16(b)*, we would render scheduling orders meaningless and effectively would read *Rule 16(b)* and its good cause requirement out of the Federal Rules of Civil Procedure."); see also, *Johnson v. Mammoth Recreations, Inc., 975 F.2d at 609-11; Riofrio Anda v. Ralston Purina, 959 F.2d 1149, 1154-55 (1st Cir. 1992)*. Accordingly, while by its literal terms, the Court's decision, in *Bell*, applies the strictures of *Rule 15(a)*, we cannot responsibly read its omission of any *Rule 16(b)* considerations, as reflecting [**15] a judicial evisceration of that Rule's insistence upon a showing of "good cause" if a Motion to Amend would traverse a Scheduling Order of the Court. We do not accept a "failure of advocacy" interpretation of *Bell* facilely, for such an approach would do unmistakable violence to the concept of *stare decisis*. Nevertheless, we cannot attribute to our Court of Appeals a holding whose import -- by every appearance -- was not drawn to the Court's attention. If an exception to the "good faith" requirement of *Rule 16* were to be carved by *Rule 15*, then we can conceive of no more devastating undercutting of that requirement for, invariably, a Motion to add claims or defenses unalterably ravages any pre-existing Scheduling Order because of the additional discovery, and Motion practice, which such an amendment necessarily evokes. Accordingly, our analysis turns to the "good cause" requirements of *Rule 16(b)*.[2]

2    Even applying the indulgence of *Rule 15(a)*, Aon's Motion fails. We can accept, as Aon contends, that Motions to Amend should be allowed, at any time, when the Motion will not prejudice the interests of the opposing party, but we view

187 F.R.D. 578, *; 1999 U.S. Dist. LEXIS 11718, **

the harm caused by a belated Motion to Amend to potentiate, almost ineluctably, to the infliction of substantial prejudice when new claims, or defenses, are raised long after the moving party was on notice of that claim, or reasonably should have been aware that such a claim existed. In considering Aon's Motion, solely on the criteria in *Foman*, we are unable to adopt Aon's view that ADM would not be prejudiced by the proposed amendments. All concede that the suggested amendments would broadly expand the issues in the case, would necessitate a significant enlargement in the scope of the parties' current discovery, and would require the duplication of the discovery which the parties have already undertaken. Nevertheless, under our current Schedulling Order, only about one month of discovery remains available to the parties. Given these circumstances, prejudice to ADM is unavoidable. As we have noted, in *Bell*, the plaintiff sought leave to amend her Complaint four days after the deadline for the filing of such a Motion and, as here, her proposed amendment would have infused different factual and legal issues than those asserted in her original Complaint, and would have required additional discovery, as well as an extension of the existing pretrial deadlines. In the Court's view, those factors created sufficient prejudice to the nonmoving party as would justify the District Court's refusal to grant leave to amend. *Bell v. Allstate Life Ins. Co., 160 F.3d 452, 454 (8th Cir. 1998)*; see also, *Rouse v. Farmers State Bank, 866 F. Supp. 1191, 1199 (N.D. Iowa 1994)*("Additional discovery and trial preparation which results from late amendment constitutes prejudice of sufficient magnitude to deny a motion to amend."). As a consequence, even if our analysis were solely driven by *Rule 15(a)*, we would deny Aon's Motion because of the prejudice such an amendment would cause to ADM.

[**16]   [*584]   As noted, in order to show good cause for its request to amend its Answer at this late date, Aon must demonstrate that, despite its exercise of due diligence, it could not have raised these proposed affirmative defenses in a timely manner under the Pretrial Schedule. In this case, it must be shown that Aon had exercised due diligence in developing its defenses to ADM's claims, but that the proposed defenses, which it now seeks to assert, could not have been raised in Aon's first Answer, which was filed only two months ago, on March 8, 1999. If Aon "was not diligent, the inquiry should end." See, *Johnson v. Mammoth Recreations, Inc., 975 F.2d at 609.*

Here, our inquiry ends near its beginning, for Aon has shown no diligence in pleading its newly proposed claims, when they either were apparent to Aon, or should have been reasonably apparent. In fact, all of Aon's newly proposed affirmative defenses were available to it from the outset of this litigation, and should have been raised in Aon's Answer. The defenses which are founded upon ADM's failure to timely complain to Aon, that the Hartford policy did not meet ADM's specifications, should have been obvious to Aon, who [**17] was uniquely positioned to know when ADM first informed Aon of its dissatisfaction with the policy terms, and when it should have. Aon does not argue otherwise, nor does it offer a reason for its failure to more expeditiously assert the claimed defenses of promissory estoppel, equitable estoppel, collateral estoppel, judicial estoppel, or laches. Aon's attempt, at this late juncture, to raise these defenses, finds no support in a bona fide showing of good cause, and the omission of these defenses appears to be inexplicable if, in fact, the defenses have any importance, and are not mere make-weight. See, *Luigino's, Inc. v. Pezrow Cos., 178 F.R.D. at 525.*

As for those defenses, which are based upon ADM's alleged price fixing activities, Aon offers no explanation for its failure to assert them at an earlier time. ADM has cogently illustrated, through newspaper clippings and various public filings, that its asserted price fixing has garnered public attention for a number of years, and certainly before Aon filed its Answer in this matter. In 1995, the Antitrust Division of the Department of Justice publicly announced that it was investigating possible anti-competitive practices, [**18] by ADM, in the marketing of high fructose corn syrup, citric acid, and lysine. In October of 1996, ADM entered a guilty plea to violating the Federal antitrust laws with respect to the citric acid and lysine markets. Additionally, three former ADM executives were convicted of fixing the price of lysine in September of 1998. Meanwhile, a class action has been pending, since at least 1995, in which it is claimed that ADM has conspired to commit anticompetitive activity in the high fructose corn syrup market. See, *In re High Fructose Corn Syrup Litigation, 936 F. Supp. 530, Master File No. 95-1477 (C.D. Ill.).*

Against this backdrop of public notoriety, we find Aon's failure to timely plead defenses which, purportedly, arise from the same publicly disclosed misdeeds, or asserted misdeeds, to be wholly beyond comprehension. In its Memorandum, Aon glosses this point by contending, in conclusory language, that its "investigation and evaluation of ADM's damage claims has raised the possibility that ADM was involved in illegal price-fixing, in violation of state and federal antitrust laws." *Def.'s Mem.* at 1. Notably, Aon does not disclose the existence of any newly obtained, material revelations about [**19]

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 31 of 42

Page 6

187 F.R.D. 578, *; 1999 U.S. Dist. LEXIS 11718, **

ADM's alleged anticompetitive behavior, which would tend to show that Aon previously had no factual basis upon which to premise its newly-framed affirmative defenses. Indeed, in a post-Hearing submission to the Court, Aon's counsel has argued that the "market pricing issues for corn and corn products were always in this case because ADM has made business interruption claims." *Letter from Alan L. Kildow to Court of 5/18/99* at 6. If the assertion is correct, then there is no apparent reason why a reasonably diligent attorney would not have previously inquired into the possibility that -- as Aon now claims -- ADM's anti-competitive conduct effectively [*585] voided any insurance coverage that ADM might now claim.

We understand Aon to contend that its interests were not well-served by its previous counsel of Record, but such an argument is a frail reed upon which to support a Motion to Amend that was not timely filed. If the substitution of legal counsel were a competent basis upon which to advance an untimely Motion to Amend, then this Court would be plagued with attorney substitutions for no better reason than to undergird a Motion to Amend either a pleading, or a Scheduling Order. In [**20] point of fact, Aon retained legal counsel of its choice, who elected to pursue certain claims and not others, and we are at a loss to understand how dissatisfaction with the elections that counsel of Record has made -- not surreptitiously, but plainly and openly -- should now warrant the abandonment of a duly promulgated Scheduling Order that was formulated with the input of the parties, as expressed by counsel of Record. Apart from its dissatisfaction with its prior legal counsel -- a basis for an amendment we find utterly unavailing -- Aon has failed to demonstrate that, through the exercise of diligence, it could not have raised the affirmative defenses, that it now seeks to mount in this proceeding, on a timely basis.

Lastly, we recognize that, under the Federal Rules, Aon was not required to file its Answer until a ruling on its Motion to Dismiss had been issued. Nevertheless, during the one year period, between the filing of ADM's Amended Complaint and Aon's Answer, Aon had an abundance of time to carefully consider and develop its defenses, as the action was not stayed during the pendency of the Motion to Dismiss. If anything, Aon was better positioned to formulate its defenses [**21] because of the Motion to Dismiss, as it obtained eight additional months in which to serve and file an Answer which incorporated all of the defenses that were sustainable under the proscriptions of *Rule 11, Federal Rules of Civil Procedure*. For reasons both unclear, and unstated, Aon did not employ the opportunities presented so as to perfect the claims of its Answer, and avoid its wholly unnecessary, and unsupported, Motion to Amend. Finding no good cause for the Motion, we deny the same as being without merit.

b. *The Amendment of the Remaining Scheduling Order Dates.*

We have a similar dearth of good cause for the second modification which Aon proposes for our Scheduling Order in this matter. Although Aon has engaged a more spirited effort to show good cause for an additional six months of discovery, its showings are critically undercut by one resonating reality -- namely, that in the fourteen months that have passed since the Pretrial Conference in this case, Aon has yet to commence a single deposition. In fact, by all appearances, Aon's attorneys have only recently reviewed the seventy boxes of documents, which were obtained from the *Phoenix* litigation, and which have [**22] been available for review since July of 1998. With commendable candor, Aon's counsel conceded at the Hearing that, before our previous modification of the Pretrial Schedule, Aon had not conducted discovery with the diligence that is required to defend a case of this magnitude. Following the issuance of our amended Scheduling Order, Aon has conducted a review of the 70 boxes of documents, has served additional Interrogatories and Requests for Production of Documents, and has served a host of deposition notices.

Squarely put, the question before us is whether Aon's enervated interest in discovery, as revealed in the last several months, should erase the fourteen months of nondiscovery which preceded Aon's apparent epiphany. We conclude that it should not. As we stated at the Hearing, to allow newfound, but sadly belated diligence to warrant an extension in the existing deadlines only encourages procrastination by rewarding the indolent for their sloth. While Aon may view the issue as only properly isolated to this case, the failure of a litigant to honor the established pretrial deadlines gravely disturbs the entirety of the Court's calendar, as well as the capacity of the Court to [**23] promptly address the concerns of those litigants who do abide by Scheduling Orders and, in a real sense, the integrity of the system of Federal justice.

[*586] Nevertheless, we believe that, given the history of this case, and the actual threat that, if not allowed a reasonable opportunity to discover, Aon will be undertaking its discovery in the Trial of this action, a modest extension of the discovery deadline will accommodate the needs of Aon, will serve the interests of justice,[3] and will not affront the purposes of *Rule 1, Federal Rules of Civil Procedure*. Accordingly, we will extend discovery so that it must be completed by no later than **September 15, 1999,** nondispositive Motions must be served and filed by no later than **October 15, 1999,** dispositive Motions must be filed by no later than **December 15,**

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 32 of 42

Page 7

187 F.R.D. 578, *; 1999 U.S. Dist. LEXIS 11718, **

**1999,** and the case will be deemed "Ready for Trial" **on February 1, 2000,** or 30 days after the Court issues an Order on any then pending dispositive Motion. These extensions effectively provide the parties with an additional two months to complete their discovery without significantly delaying the "Ready for Trial" date. To this extent, we grant Aon's Motion to [**24] Amend the Scheduling Order.

> 3 Any appearance of tension, between our finding of sufficient cause to warrant an extension of the discovery deadline, and our rejection of Aon's Motion to Amend for want of "good cause," should be dispelled by the recognition that cause for any relief is relative -- the more disruptive the requested relief, the greater the need for comparable cause. Here, we can allow Aon a modest extension, in which to complete its critical discovery, without revamping the entirety of our Pretrial Schedule, and we find adequate cause to do so. Even veteran Trial practitioners can underestimate the quantum of discovery that will be required by a given legal issue, and we conclude that Aon's former counsel of Record may have miscalculated the time that will be needed to properly address ADM's damage claim. We do not agree, however, with Aon's projection that an additional six months of discovery is either necessary or appropriate.

B. *Modification of the Number of Depositions and Interrogatories* [**25] .

1. *Standard of Review.* Rules *30(a)(2)* and *33(a), Federal Rules of Civil Procedure,* presumptively limit the number of depositions that each side may take to ten, and the number of Interrogatories, including discrete subparts, that a party may serve to 25. Of course, leave to notice additional depositions, or to serve additional Interrogatories, is governed by the provisions of *Rule 26(b)(2),* which require the Court to limit discovery if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance

of the proposed discovery in resolving the issues.

*Rule 26(b)(2), Federal Rules of Civil Procedure.*

In practical terms, a party seeking leave to take more depositions, or to serve more Interrogatories, [**26] than are contemplated by the Federal Rules or by the Court's Scheduling Order, must make a particularized showing of why the discovery is necessary. See, *Bell v. Fowler, 99 F.3d 262, 271 (8th Cir. 1996)*(where plaintiff "presented no good reason why additional depositions were necessary * * * the district court committed no abuse of discretion" in denying leave to do so); *Mead Corp. v. Riverwood Natural Resources Corp., 145 F.R.D. 512, 518 (D. Minn. 1992)*(denying leave to serve additional Interrogatories, where party did not demonstrate necessity by showing the specific content of those Interrogatories); *Capacchione v. Charlotte-Mecklenburg Schools, 182 F.R.D. 486, 492 (W.D.N.C. 1998)*(denying leave to serve additional Interrogatories where party gave no explanation of their subject matter); *Whittingham v. Amherst College, 163 F.R.D. 170, 171 (D. Mass. 1995)*(Federal Rules require party to make specific showing of necessity, and to first exhaust available discovery before seeking leave of Court for supplemental discovery).

2. *Legal Analysis.* Our consideration of this aspect of Aon's Motion is decidedly influenced [**27] by the fact that ADM has produced, for Aon's review, all of the discovery, inclusive of deposition transcripts, which was [*587] amassed in the *Phoenix* litigation, and which involved issues which overlap certain of those presented here. Cf., *Rule 26(b)(2)(i-ii), Federal Rules of Civil Procedure.* Of course, the existence of this wealth of discovery should not preclude Aon's opportunity to depose witnesses, who were deposed in *Phoenix,* as Aon has an understandable interest in questioning certain of those witnesses with specific focus on the claims that ADM has asserted in support of its claim that Aon committed malpractice. The burden imposed by such focused discovery should be minimal. Accordingly, we deny that portion of ADM's Motion for a Protective Order, which seeks to prevent Aon from deposing anyone who was deposed in the *Phoenix* case.

Overriding the limits of 20 depositions, and 25 Interrogatories, which were established by our Pretrial Order, however, is another matter. Aon has yet to take any depositions in this case, and it advises that it has not exhausted the 25 Interrogatories that were earlier afforded to it. We have no cause, here, to presume that those lim-

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 33 of 42

Page 8

187 F.R.D. 578, *; 1999 U.S. Dist. LEXIS 11718, **

its [**28] are critically insufficient or, if they are, how many more Interrogatories, and depositions, should suffice -- given the issues properly open to inquiry in this matter. On the Record presented, Aon has not demonstrated any need for a more expansive allowance of Interrogatories, or depositions. Although Aon has identified 47 proposed deponents, and has broadly stated the supposed relevance of their testimony, it has made no showing that each of the deponents is essential to its discovery, and is not merely a replication of discovery that could be best accomplished with the number of deponents we previously allocated. At a minimum, Aon should appropriately exhaust its current quota of depositions, in order to make an informed request for an opportunity to depose more witnesses, before seeking leave to depose a legion of others. See, *Bell v. Fowler, 99 F.3d at 271; Whittingham v. Amherst College, 163 F.R.D. at 171*. By specifically limiting the number of depositions, the drafters of *Rule 30* clearly did not contemplate that depositions should either be unlimited in quantity, or be available without a showing of need. The same may be said of Aon's request for additional [**29] Interrogatories, as the request is bereft of any showing that specific Interrogatories are required if Aon is to properly defend itself against ADM's claims. See, *Mead Corp. v. Riverwood Natural Resources Corp., 145 F.R.D. at 518; Capacchione v. Charlotte-Mecklenburg Schools, 182 F.R.D. at 492*. In the absence of a showing of need, this aspect of Aon's Motion to Amend the Scheduling Order is denied. [4]

> 4 Aon's counsel represented, at the time of the Hearing, that some of the depositions, that it has proposed, are in lieu of the witness's in-Court testimony. We stated our view then, which we reiterate here, that Trial depositions are not governed by the limits set forth in our Pretrial Order, but any effort to conduct discovery, under the guise of taking "in lieu testimony," will not be condoned, and will be appropriately sanctioned. On this Record, we are unable to determine which depositions are intended for Trial purposes.

C. *The Venue for the Depositions of ADM's Directors, Officers,* [**30] *and Employees.*

Aon contends, with general support in the law, that ADM should be required to produce, for deposition purposes, its witnesses -- and, particularly, its directors, officers and employees -- in the District of Minnesota, where ADM has chosen to prosecute its claims against Aon. As a threshold matter, a distinction should be drawn between ADM's ordinary employees, and its directors, officers, and other high-level representatives. "Except where the employee has been designated by the corporation under *Rule 30(b)(6),*" or is an officer, direc-

tor, or managing agent, "an employee is treated in the same way as any other witness," and "his or her presence must be obtained by subpoena rather than notice. * * * *." Wright, Miller & Marcus, 8A *Federal Practice & Procedure: Civil 2d § 2103*, pp. 36-37. Thus, ordinary employees are subject to the general rule that a deponent should be deposed near his or her residence, or principal place of work. See, e.g., *Metrex Research Corp. v. United States, 151 F.R.D. 122, 125 (D. Colo. 1993)*; see also, *Rule 45(c)(3)(A)(ii), Federal Rules of Civil Procedure* (directing Court to quash or modify subpoena if it "requires [**31] a person who is not a party or an [*588] officer of a party to travel more than 100 miles from the place where that person resides, is employed or regularly transacts business in person"). ADM's obligation to produce certain of its managing agents for depositions in this District, does not trump the right of its lower level employees to insist on being deposed in the State of their residence, or their principal place of employment.

As to ADM's officers, directors, managing agents, and *Rule 30(b)(6)* designees, there is a well-recognized, general rule that a plaintiff is required to make itself available for a deposition in the District in which the suit was commenced, because the plaintiff has chosen the forum voluntarily, and should expect to appear there for any legal proceedings, whereas the defendant, ordinarily, has had no choice in selecting the action's venue. See, e.g., *General Houses v. Marloch Manufacturing Corp., 239 F.2d 510, 514 (2nd Cir. 1956); Gibbs v. National R.R. Passenger Corp., 170 F.R.D. 452, 453 (N.D. Ind. 1997); South Seas Catamaran, Inc. v. Motor Vessel Leeway, 120 F.R.D. 17, 21 (D.N.J. 1988)*, aff'd, *993 F.2d 878 (3rd Cir. 1993)*. [**32]

At best, however, this is a general rule which is subject to exception, when the plaintiff can make a compelling showing that its application would impose an unduly heavy burden, or that the overall efficiency of the discovery process would be better served by deposing the plaintiff, and its agents, outside of the forum District. See, *Federal Practice & Procedure: Civil 2d § 2112* at 77-81, and cases cited therein. In the final analysis, our selection of the forum for a plaintiff's deposition should not be rigidly formulaic for, in the interests of justice, we have "great discretion in designating the location of taking a deposition," *Thompson v. Sun Oil Co., 523 F.2d 647, 648 (8th Cir. 1975)*, and that discretion must be directed toward "considering each case on its own facts and the equities of the particular situation." *Turner v. Prudential Ins. Co. of America, 119 F.R.D. 381, 383 (M.D.N.C. 1988)*, citing *Leist v. Union Oil Co., 82 F.R.D. 203 (E.D. Wis. 1979)*.

ADM has demonstrated, we think persuasively, that the equities require that the exception, and not the general rule, govern the place where its corporate directors,

187 F.R.D. 578, *; 1999 U.S. Dist. LEXIS 11718, **

officers, [**33] and *Rule 30(b)(6)* designees, should be taken. Apparently, that location is Decatur, Illinois, where the bulk of these corporate representatives work and reside. Conducting the depositions in a common location, such as Decatur, would minimize the logistical difficulties, and the expense of all concerned, which would be caused by taking these depositions in a variety of distant forums; would minimize the wasted time of the deponents, as they await the taking of their depositions; and would permit the depositions to proceed, on after the other, with the least amount of nonproductive time for the deposing attorneys. If a deponent completes his testimony ahead of schedule, or behind, it is far less cumbersome to correspondingly advance, or defer, the commencement of the next deposition, without altering the interstate itineraries of the attorneys and the other deponents.

If ADM's party-deponents were scattered throughout the country, we would be persuaded that conducting their depositions in Minnesota, or some other central, convenient location would be the preferred course. The parties have indicated, however, that all of these deponents reside in the vicinity of Decatur, and can be readily [**34] produced, by ADM, in Decatur. As a consequence, we deny this aspect of Aon's Motion to Compel, and grant ADM's Motion for a Protective Order. If specific problems arise, the parties can draw them to the Court's attention, but the venue of the depositions of ADM's directors, officers, and *Rule 30(b)(6)* designees, shall be in Decatur, Illinois, absent further Order of the Court.

D. *Antitrust Discovery.* What remains for resolution is that portion of ADM's Motion for a Protective Order which seeks to preclude Aon from inquiring, during the course of discovery, into ADM's claimed violation of State and Federal antitrust laws. Our denial of ADM's Motion to Amend its Answer, in order to raise affirmative defenses that are based upon alleged antitrust violations, does not, by itself, foreclose the relevance of such discovery. Aon argues that ADM's purportedly illegal manipulation of [*589] the market price of its products is inextricably intertwined in ADM's calculation of damages, thereby opening those issues for needed discovery -- a proposition that ADM vehemently denies.

1. *Standard of Review.* The threshold requirement of discoverability is whether the information sought is "relevant [**35] to the subject matter involved in the pending action." *Shelton v. American Motors, 805 F.2d 1323, 1326 (8th Cir. 1986).* Of course, to be discoverable, the information "need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." *Rule 26(b)(1), Federal Rules of Civil Procedure.* The standard, therefore, is widely recognized as one that is necessarily broad in its scope, in order to allow the parties

essentially equal access to the operative facts. See, *Hofer v. Mack Trucks, Inc., 981 F.2d 377, 382 (8th Cir. 1992); Leighr v. Beverly Enterprises-Kansas, Inc., 164 F.R.D. 550 (D. Kan. 1996); Cox v. E.I. Du Pont de Nemours & Co., 38 F.R.D. 396, 398 (D.S.C. 1965).* Notwithstanding the liberality of discovery, however, it is not without bounds. As our Court of Appeals has observed:

> This often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information [**36] which does not reasonably bear upon the issues in the case.

*Hofer v. Mack Trucks, 981 F.2d at 380.*

Therefore, despite the liberality of discovery, "we will remain reluctant to allow any party to 'roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so.'" *Onwuka v. Federal Express Corp., 178 F.R.D. 508, 516 (D. Minn. 1997); Carlson Cos., Inc. v. Sperry & Hutchinson Co., 374 F. Supp. 1080, 1089 (D. Minn. 1974);* see also, *Blum v. Schlegel, 150 F.R.D. 38, 39 (W.D.N.Y. 1993).*

Even when dealing with requests for relevant information, the Rules recognize that discovery may be limited when the benefits to be obtained are outweighed by the burdens and expenses involved. According to *Rule 26(b)(2), Federal Rules of Civil Procedure,* we are directed to limit discovery upon a determination that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by [**37] discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issue at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 35 of 42

Page 10

187 F.R.D. 578, *; 1999 U.S. Dist. LEXIS 11718, **

These considerations are not talismanic. Rather, they are to be applied in a common sense, and practical manner. See, *In re Convergent Tech. Securities Litigation, 108 F.R.D. 328, 331 (D. Cal. 1985).*

2. *Legal Analysis.* We approach this issue with decided trepidation, as the issues have been poorly framed, the parties' efforts to clarify their contentions have not been fully enlightening, and their proposals are at the polar ends of a broad spectrum. In addition, there has been a distinct tendency, by both sides, to argue in the abstract, and to formulate their arguments on the semantical niceties of insurance coverage jargon. Aon advises that it cannot be expected to provide a fully definitive specification as to the relevance of ADM's unlawful, anticompetitive activities, competitive activities, [**38] since it has not yet explored the depths of its suspicions as to ADM's illicit pricing conduct. ADM maintains, with passing persuasiveness, that it is not seeking damages for loss of income, but only for the increased costs, and expenses, that were incurred in securing alternative raw materials for those which were destroyed in the 1993 flood. If true, we cannot fathom how any alleged price fixing, by ADM, as to the market value of its manufactured goods, could impact upon the price that ADM was required to pay, to independent [*590] producers of raw source materials, in order to replace those lost in the flood.

On the other hand, if Aon has accurately represented that ADM is, in fact, claiming lost profits as to goods, which were the subject of admitted price fixing, or which are responsibly the subject of such claims, then ADM's computation of damages would necessarily implicate the discovery that Aon requests. Unfortunately, the sparsity of an informative Record hampers our ability to resolve this issue on any particularized basis. We are satisfied that a mechanism is required to "gatekeep" the prospect of whether, or to what extent, the parties' discovery should traipse into the potentially [**39] bottomless pit of antitrust price fixing.

As a consequence, we neither grant, nor deny, this aspect of ADM's Motion for a Protective Order, but we instruct Aon that, if it intends to inquire into this subject area, it must first present a cogent showing that ADM is claiming specific categories of damages, which are generated by admitted price fixing activities, or which are necessarily impacted by unlawful competitive practices as informed by generally accepted accounting practices, or by accepted principles of economic theory. We think that, of necessity, such a showing will require the taking of a *Rule 30(b)(6)* deposition specifically related to ADM's computation of damages, and to the impact, if any, that alleged price fixing either has had, or would properly have, upon that computation. If a plausible showing of relevance can be made, then continued discovery in that field of inquiry would appear to be indisputable.

At its core, this is a malpractice action, and not an anti-trust proceeding. An unrestricted exploration of claimed price fixing, as urged by Aon, would hopelessly inter the action in interminable, and extremely expensive, discovery. We are not prepared to allow this [**40] fairly straightforward action to be wrenched into the serpentine labyrinth frequented by complex litigation without a convincing showing that such a course is appropriate. Such a showing has not been made, nor could we expect such a showing without the preliminary inquiry that we have formulated. [5] Given this late stage in the discovery process, we reiterate that discovery should be both narrow, and focused, but we are obligated, by circumstances beyond our control, to leave the specific dimensions of discovery for further factual development.

> 5    As but one example, Aon suggests that ADM claims losses because ADM sought to funnel certain of its raw materials into areas which generated abnormal profits as a result of unlawful anti-trust activities. Unfortunately, we have not been presented with any demonstration that specific items of ADM's claimed damages reflect such business practices by ADM. Upon such a showing, Aon is at liberty to raise the issue again.

NOW, THEREFORE, It is --

ORDERED:

1. That the Defendant's [**41] Motion to Amend the Pretrial Order [Docket No. 68, pt. 1] is GRANTED, in part, and our Pretrial Order is amended to provide that all discovery shall be completed **by no later than September 15, 1999**, that all nondispositive Motions shall be filed **by no later than October 15, 1999**, that all dispositive Motions shall be filed **by no later than December 15, 1999**, and that the case shall be "Ready for Trial" **on February 1, 2000**, or 30 days after the Court issues an Order on any then pending dispositive Motion.

2. That the Defendant's Motion to Amend its Answer [Docket No. 68, pt. 2] is DENIED.

3. That the Defendant's Motion to Compel Depositions [Docket No. 68, pt. 3] is DENIED.

4. That the Plaintiff's Motion for a Protective Order [Docket No. 73] is GRANTED in part, as more fully detailed in the text of this Order.

BY THE COURT:

Raymond L. Erickson

UNITED STATES MAGISTRATE JUDGE

LEXSEE 2008 US DIST LEXIS 54164



Positive
As of: Jul 30, 2008

**MICHAEL S. MAPES, et al., Plaintiffs vs. WELLINGTON CAPITAL GROUP, Defendant.**

**8:07CV77**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA**

*2008 U.S. Dist. LEXIS 54164*

**March 4, 2008, Decided**
**March 4, 2008, Filed**

**SUBSEQUENT HISTORY:** Affirmed by, Appeal dismissed by *Mapes v. Wellington Capital Group, Inc., 2008 U.S. Dist. LEXIS 36446 (D. Neb., May 5, 2008)*

**COUNSEL:** [*1] For Michael S. Mapes, Milton Petersen, IV, Brian Leichner, David Mohr, David Stading, Plaintiffs: James M. Sulentic, John P. Passarelli, KUTAK, ROCK LAW FIRM - OMAHA, Omaha, NE.

For Wellington Capital Group, Inc., Defendant: Elizabeth M. Callaghan, Michael J. Mooney, Robert A. Mooney, GROSS, WELCH LAW FIRM, Omaha, NE.

For Wellington Capital Group, Inc., Counter Claimant: Elizabeth M. Callaghan, Michael J. Mooney, Robert A. Mooney, GROSS, WELCH LAW FIRM, Omaha, NE.

For Michael S. Mapes, Milton Petersen, IV, Brian Leichner, David Mohr, David Stading, Counter Defendants: John P. Passarelli, KUTAK, ROCK LAW FIRM - OMAHA, Omaha, NE.

**JUDGES:** Thomas D. Thalken, United States Magistrate Judge.

**OPINION BY:** Thomas D. Thalken

**OPINION**

**ORDER**

This matter is before the court on the defendant's Motion to Quash (Filing No. 40). The plaintiffs filed a brief (Filing No. 43) and an index of evidence (Filing No. 44) in opposition to the motion. [1] The defendant filed a brief (Filing No. 46) and an index of evidence (Filing No. 47) in reply. The motion relates to depositions initially scheduled for February 5, 2008. The court previously held a telephone conference with counsel for the parties on February 1, 2008, regarding the motion and [*2] held the depositions in abeyance pending resolution of these issues. See Filing No. 42.

> 1    The plaintiffs brief does not set forth any opposition to the defendant's motion to quash the deposition notice for Matt Mokwa.

**BACKGROUND**

On February 19, 2007, the plaintiffs filed the instant action for breach of contract and declaratory judgment. See Filing No. 1. In the complaint, the plaintiffs allege the following facts. On July 13, 2006, the defendant agreed to purchase from the plaintiffs all of the capital stock of four companies, which will be referred to collectively as the Alliance Companies. The agreement included an immediate payment for fifty percent of the proceeds, with the balance represented by five promissory notes. Each of the promissory notes was signed by Mr. Amodeo, on behalf of the defendant as the owner, Chairman and authorized agent of the defendant. Other evidence shows Mr. Amodeo is also the Sole Director and Shareholder of the defendant. See Filing No. 44 Ex. 1 - Passarelli Decl. P 17 and attached Exs. K through N. The plaintiffs allege the defendant is in breach of the agreement and the promissory notes. See Filing No. 1.

Further, the plaintiffs allege the defendant [*3] has failed to preserve the value of the Alliance Companies and other collateral.

On April 18, 2007, the defendant filed an answer and counterclaims against each of the plaintiffs. See Filing No. 11. The defendant alleges the following additional facts in the answer and counterclaim. The defendant purchased the Alliance Companies based on various representations made by the plaintiffs, including the amount of gross revenues. In August of 2006, Mirabillis Ventures, Inc. (Mirabillis) purchased the Alliance Companies from the defendant. Mirabillis is affiliated with the defendant. Mirabillis agreed to pay the remaining amounts due to the plaintiffs. In December of 2006, Mirabillis sold the Alliance Companies to PaySource, Inc. (PaySource), whose sole owner was Robert Sacco. The sale was contingent upon the Alliance Companies maintaining a certain degree of customer and financial stability. PaySource executed a promissory note (PaySource Note) in favor of the defendant and Mirabillis in the amount of the initial purchase price that the defendant agreed to pay the plaintiffs. The PaySource Note payments were scheduled to begin in February of 2007. The defendant alleges one of the plaintiffs, [*4] Michael Mapes, made disparaging comments to Alliance Companies' customers and other companies about the defendant and Mirabillis. Mapes' comments caused the Alliance Companies to lose customers, which in turn led PaySource to allege a breach of contract and to fail to make payments on the PaySource Note. Based on these allegations, among others, the defendant asserts counterclaims for breach of contract (Count I), fraud (Count IV) and conversion (Count V) against all of the plaintiffs. Additionally, the defendant asserts tortious interference with a business relationship (Count II) and breach of good faith and fair dealing (Count III) against Mr. Mapes.

On December 27, 2008, the defendant filed a motion to quash the notices to take depositions of Matt Mokwa, Frank Amodeo and a *Rule 30(b)(6)* representative for the defendant. **See** Filing No. 30. The stated basis for the motion was opposing counsel's failure to schedule the deposition dates in a manner which was previously agreed to and the delay of certain document production. *Id.* Further, the motion noted the plaintiffs' counsel was willing to reschedule the depositions to other dates and "[c]ounsel for Wellington are agreeable to providing [*5] alternate dates." *Id.* The court held a telephone conference with counsel for the parties on December 28, 2008. The motion to quash was granted, but the court entered an order stating:

> The plaintiffs may notice and take the depositions of Wellington Capital Group, Inc.'s *30(b)(6)* Representative, Frank

Amodeo, and Matt Mokwa **between February 1, 2008 and February 12, 2008.**

**See** Filing No. 32 (emphasis in original).

On January 25, 2008, the plaintiffs served the defendant with notices for the depositions of Frank Amodeo and Matt Mokwa to take place on February 5, 2008, at the law offices of the defendant's counsel in Omaha, Nebraska. **See** Filing Nos. 36 and 37. On February 1, 2008, the defendant filed another motion to quash stating Mr. Amodeo and Mr. Mokwa are not parties and a simple notice of deposition is insufficient to compel their appearances pursuant to *Federal Rules of Civil Procedure 30* and *45*. **See** Filing No. 40. The defendant argues the plaintiffs must serve the witnesses with subpoenas. Counsel for the parties conferred by telephone on January 29, 2008, but were unable to resolve the issue without court involvement.

**ANALYSIS**

Depositions are governed by *Federal Rule of Civil Procedure 30*. [*6] Since it is not possible to take the deposition of a corporation without a natural person to speak for the corporation, this rule "provide[s] two methods by which a corporate party to a proceeding may be deposed: (1) *Rule 30(b)(1)* provides for the deposition by notice of a corporation through a particular officer, director or managing agent of the corporation; and (2) *Rule 30(b)(6)* . . . ." *Cadent Ltd. v. 3M Unitek Corp., 232 F.R.D. 625, 627-28 (C.D. Cal. 2005)*. Pursuant to *Rule 30*:

> A party may, by oral questions, depose any person, including a party, without leave of court except as provided in *Rule 30(a)(2)*. The deponent's attendance may be compelled by subpoena under *Rule 45*.

*Fed. R. Civ. P. 30(a)(1).*

Additionally, the rule contains a notice provision as follows.

> A party who wants to depose a person by oral questions must give reasonable written notice to every other party. The notice must state the time and place of the deposition and, if known, the deponent's name and address.

*Fed. R. Civ. P. 30(b)(1).*

Parameters for notice with regard to an organization is further delineated such that

> a party may name as the deponent a public or private corporation, . . . and must describe with reasonable [*7] particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. . . . The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

*Fed. R. Civ. P. 30(b)(6).*

These rules must be read in conjunction with *Rule 37(d)*, which states:

> The court where the action is pending may, on motion, order sanctions if:
>
> > (i) a party or a party's officer, director, or managing agent--or a person designated under *Rule 30(b)(6)* or *31(a)(4)*--fails, after being served with proper notice, to appear for that person's deposition;

*Fed. R. Civ. P. 37(d)(1)(A)*; **see also** *Fed. R. Civ. P. 45(c)(3)(A)(ii)* (directing court to quash or modify subpoena if it "requires a person who is not a party or an officer of a party to travel more than 100 miles from the place where that person resides, is employed or regularly transacts business in person").

Furthermore, "[u]nder *30(b)(1)*, [*8] it is well recognized that 'if the corporation is a party, the notice compels it to produce any 'officer, director or managing agent' named in the deposition notice. It is not necessary to subpoena such individual.'" *Cadent Ltd., 232 F.R.D. at 627 n.1* (quotation omitted); **see also *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 220 F.R.D. 235, 237 (S.D.N.Y. 2004)*; Carlson Wagonlit Travel, Inc. v. Invensys PLC, No.***

*Civ. 01-2337, 2003 U.S. Dist. LEXIS 7724, 2003 WL 21010961, 2 (D. Minn. Mar. 8, 2003)* ("Notice under *Rule 30(b)(1)* of the Federal Rules of Civil Procedure is sufficient to depose a corporate employee who is an officer, director, managing agent, or *Rule 30(b)(6)* designee"); *Archer Daniels Midland Co. v. Aon Risk Servs., Inc., 187 F.R.D. 578, 587 (D. Minn. 1999)* ("Except where the employee has been designated by the corporation under *Rule 30(b)(6)*," or is an officer, director, or managing agent, "an employee is treated in the same way as any other witness," and "[h]is or her presence must be obtained by subpoena rather than notice.") **(quoting** CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2103).

The defendant maintains that Mr. Amodeo is not a party to this [*9] action, although the defendant does not dispute Mr. Amodeo's status with the defendant. The defendant argues that neither the plain language of *Rule 30*, nor "authority in this jurisdiction" interpreting the rule dispense with the subpoena requirement. However, it is well known

> the corporation is responsible for producing its officers, managing agents, and directors if notice is given; a subpoena for their attendance is unnecessary, and sanctions may be imposed against the corporation if they fail to appear. . . . [T]he depositions of persons who fit these categories may be used against the corporate party. It is in this sense, in respect of the responsibility to produce the deponent and of the usability of the deposition, that the deposition of the corporation is said to be "taken through" the particular individual.

CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2103. Courts in this circuit adhere to the general rule. *See Schembre v. AGR Const. Co., No. 4:06-CV-943, 2007 U.S. Dist. LEXIS 81650, 2007 WL 3268443, at *1 (E.D. Mo. Nov. 2, 2007)* ("The notices were directed to Mr. Fennell as an officer of the defendants and no subpoena was required."); *United States v. Baby-Tenda Corp., No. 05-0907, 2007 U.S. Dist. LEXIS 63110, 2007 WL 2590427, at *1 (W.D. Mo. Aug. 27, 2007)* [*10] ("If the particular company representative is known, that representative may be named.") **(citing *Fed. R. Civ. P. 30(b)(1)* and WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2110)). Prior to the advent of *Rule 30(b)(6)*, parties were required to identify particular officers, however the change in the rules, to put some burden on the deponent corporation of naming unknown corporate agents, does not increase the burden on the other parties when they

Case 1:07-cv-06654    Document 36-5    Filed 07/30/2008    Page 39 of 42

Page 4
2008 U.S. Dist. LEXIS 54164, *

seek to depose a known corporate agent. See *Fed. R. Civ. P. 30(b)(6)* ("This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules."); WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2110. Accordingly, the court finds the federal rules and case law are abundantly clear that the plaintiffs' notice, without a subpoena, for Mr. Amodeo was adequate to require his attendance at the deposition.

The defendant next argues Mr. Amodeo should not be required to appear for the deposition in Omaha, Nebraska. See Filing No. 46 - Reply p. 8. The defendant notes the defendant's headquarters is located in Florida. This argument was not raised in the original motion or during the telephone conference with the undersigned magistrate [*11] judge. However, the defendant contends this is independent justification to quash the deposition notice.

"The deposition of a corporation by its agents and officers should ordinarily be taken at its principal place of business. This is subject to modification, however, when justice requires." WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2112. The party proposing an alternate location for the deposition has the burden of overcoming the general presumption. See *McDougal-Wilson v. Goodyear Tire, 232 F.R.D. 246, 249 (E.D.N.C. 2005).* The court has the authority to determine the location of the deposition. *Fed. R. Civ. P. 26(c)(1)(B).*

The defendant gives no reason other than the general rule, for why Mr. Amodeo should be deposed in a location other than as noticed. Further, it is noted the defendant has already produced another witness pursuant to *Rule 30(b)(6)* in Omaha for deposition. In any event, the defendant failed to confer with opposing counsel about this issue prior to raising it in the reply brief, as required by the federal and local rule. See, e.g., NECivR 7.1(i). Accordingly, the court will determine the location of the deposition in accordance with the original deposition notice. [*12] Alternatively, the court orders the defendant to produce Mr. Amodeo for deposition in Omaha, Nebraska, as a sanction as discussed below.

The plaintiffs seek sanctions with regard to the defendant's and Mr. Amodeo's conduct related to the instant motion and throughout discovery associated with this case. An assessment of sanctions is authorized by *Rule 30(d)* for impeding, delaying or frustrating the fair examination of a deponent, or by *Rule 26(c)(2).* The defendant opposes any award of sanctions and states its actions were reasonable consistent with a reasonable interpretation of the law. Additionally, the defendant contends it did not waive any arguments raised in the second motion to quash by virtue of the arguments raised in the first motion. Further, the defendant states that, at that time, counsel anticipated designating Mr. Amodeo

and/or Mr. Mokwa as the defendant's *Rule 30(b)(6)* witness. Only later the decision was made to designate someone else. The *Rule 30(b)(6)* deposition has now been completed. Finally, the defendant contends that counsel asked the plaintiffs' counsel for legal authority for their position on more than one occasion without response.

The defendant did not specify [*13] under which rule the motion to quash falls. However, *Federal Rule of Civil Procedure 26(c)* and *30(d)* provide for sanctions under *Rule 37(a)(5)* to motions filed under the rules. Furthermore, *Rule 37(a)(5)(B)* provides that if the discovery motion is denied, sanctions shall be awarded against the moving party absent a showing of good cause for the nondisclosure by the opposing actor. See *Fed. R. Civ. P. 37(a)(5)(B).* The Advisory Committee Notes to the 1970 Amendments to *Rule 37* indicate that, on many occasions, "the dispute over discovery between the parties is genuine, though ultimately resolved one way or the other by the court. In such cases, the losing party is substantially justified in carrying the matter to court." See *Fed. R. Civ. P. 37* Advisory Committee Notes (1970) regarding then *Rule 37(a)(4).* Additionally, where the motion is granted in part and denied in part, the court may apportion the reasonable expenses for the motion. See *Fed. R. Civ. P. 37(a)(5)(C).*

Here, the defendant's motion was not substantially justified with regard to Mr. Amodeo. There is no dispute Mr. Amodeo is an officer of the defendant subject to the notice of deposition requirement under *Rule 30(b)(1).* In [*14] any event, had the defendant been correct about Mr. Amodeo being a non-party subject to subpoena, the defendant would be without standing to challenge the deposition notice as it did. See *Smith v. Midland Brake, Inc., 162 F.R.D. 683, 685 (D. Kan. 1995)* (corporation had no standing to challenge subpoena served on its employee because corporation lacked personal right or privilege in information sought); see also *Gatewood v. Stone Container Corp., 170 F.R.D. 455, 460 (S.D. Iowa 1996).* The defendant's motion was apparently justified as to Mr. Mokwa and the plaintiffs did not oppose the motion. Under the circumstances, the court finds sanctions should be granted and imposed against the defendant. The defendant has had an opportunity to be heard with regard to the issues raised and to respond to the request for sanctions. Accordingly, the defendant shall pay the reasonable costs associated with the plaintiffs' response to the defendant's motion. Additionally, the deposition of Mr. Amodeo shall take place in Omaha, Nebraska. However, the parties shall each be responsible for their own attorney fees associated with the depositions. Upon consideration,

**IT IS ORDERED:**

2008 U.S. Dist. LEXIS 54164, *

1. The defendant's Motion [*15] to Quash (Filing No. 40) is granted in part and denied in part. The defendant's motion to quash the Amended Notice of Deposition Upon Oral Examination for Matt Mokwa (Filing No. 37) is granted. Otherwise, the motion is denied.

2. The defendant shall make Mr. Amodeo available for deposition upon notice of the plaintiffs within thirty days of this order. The deposition shall take place in Omaha, Nebraska.

3. The defendant shall pay the reasonable costs associated with the plaintiffs' brief responding to the defendant's motion to quash. Counsel for the parties shall confer on a reasonable amount to be awarded and, if there is agreement, shall file **on or before March 19,** **2008,** a stipulation of the costs and fees to be awarded. In the event the parties fail to reach an agreement, the plaintiffs may file **on or before March 24, 2008,** an application for the award of the costs and fees accompanied by an affidavit of such costs and fees, pursuant to NECivR 54.4. The defendant shall have **until on or before April** **2, 2008,** to respond to the application. Thereafter, the issue of costs will be deemed submitted and a written order entered.

DATED this 4th day of March, 2008.

BY THE COURT:

/s/ Thomas D.  [*16] Thalken

United States Magistrate Judge

LEXSEE 120 FRD 58



Positive
As of: Jul 30, 2008

**Michael R. KASPER, an individual, Plaintiff, v. COOPER CANADA LIMITED, a Canadian Corporation, Defendant**

**No. 87 C 5633**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*120 F.R.D. 58; 1988 U.S. Dist. LEXIS 820*

**January 25, 1988, Decided
January 26, 1988, Filed**

**JUDGES:** Marvin E. Aspen, District Judge.

**OPINION BY:** [**1] ASPEN

**OPINION**

[*58] MEMORANDUM ORDER

MARVIN E. ASPEN, District Judge:

Defendant Cooper Canada Limited's ("Cooper") motion to reconsider this Court's ruling denying Cooper's motion to reject Magistrate Lefkow's discovery ruling in this case is denied. Magistrate Lefkow denied Cooper's motion to vacate plaintiff's deposition notices. Before the Magistrate, Cooper objected to plaintiff Kasper's [*59] notice of two Cooper officers for deposition in Chicago, Illinois, instead of Cooper's principal place of business in Toronto, Canada. Based on the following findings, the Magistrate ruled the depositions may be taken in Chicago: that counsel for both parties were located in Chicago; that many of the requested documents were in Chicago; and that the defendant corporation had substantial business operations in Chicago. These facts coupled with the fact that plaintiff is an individual financing the litigation on a contingent fee arrangement led the Magistrate to conclude that "justice will not be disserved by permitting the depositions to proceed as noticed."

Cooper contends that the Magistrate's [**2] ruling is clearly erroneous and contrary to law. We disagree and find *based on the record before the Magistrate* that her ruling was neither clearly erroneous nor contrary to law.

First, we address Cooper's position that the Magistrate's factual findings were "clearly erroneous." In support of this position, Cooper submits the affidavit of a Mr. Marten Burns to prove that none of the requested documents are in Chicago, and that Cooper does not have substantial business operations in Chicago. However, the Magistrate did not have the benefit of this affidavit, and therefore we will not consider it on appeal of her rulings. We are not to make a *de novo* determination. *See Fed.R.Civ.P. 72(a)*. Thus, we examine only the information before the Magistrate to determine if her factual findings were clearly erroneous. The only information before the Magistrate was the parties' respective briefs which included Kasper's statements concerning Cooper's business dealings in Chicago:

(a) Cooper transacts a considerable amount of business in this District through large volume retailers such as Gunzo's Sporting Goods in River Forest, Illinois,

(b) Cooper has a sales distributor in Arlington [**3] Heights, Illinois,

(c) Cooper has a "repair depot" in Glen Ellyn, Illinois and

(d) Cooper has retained in this district principal trial counsel rather than merely local counsel.

(Kasper, Memo at 3).

120 F.R.D. 58, *; 1988 U.S. Dist. LEXIS 820, **

Rather than submit any rebuttal to these factual assertions, Cooper merely stated in its reply "Cooper's minimal business contacts with Chicago (Kasper's Memo p.3) might be relevant to venue or jurisdiction, but are irrelevant in determining the location of a deposition." Additionally, although Cooper stated in its memorandum that "the documents plaintiff is requesting are located in Toronto, Canada," when Kasper suggested in response that the documents were already in Chicago, [1] Cooper did not deny this in its reply. Accordingly, based on the information before the Magistrate, we do not find her findings of fact clearly erroneous.

> 1   "It is conceivable that many of the documents which respond to Kasper's Document Requests are already in Chicago given that Cooper's pending Summary Judgment Motions were submitted with various exhibits which could have only been obtained from Cooper files in Toronto." (Kasper, Memo at 3).

Secondly, Cooper contends that the Magistrate's ruling [**4] was contrary to law. We disagree. "In the case of depositions of witnesses who are parties to the action . . . . the limitations upon compelling attendance under *Rule 45(d)(2)* do not apply, [and] the notice may require attendance at any place." 4A J. Moore, *Moore's Federal Practice* § 30.57[7] (1987). If the place stated in the notice is inconvenient, the party whose deposition is to be taken may move under *Rule 26(c)* for a protective order that it be taken elsewhere. *Id.* The standard under *Rule 26(c)* is "good cause." "Upon motion by a party or by the person from whom discovery is sought, and for *good cause shown,* the court . . . . may make any order which justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden or expense . . . .." *Fed.R.Civ.P. 26(c)*. Cooper did not move for a protective order below and did not attempt to show good cause that it would be subjected to "annoyance, embarrassment, oppression, or undue burden or expense," by having its two corporate officers deposed in Chicago. Instead, Cooper relied on the incorrect contention of law [*60] that corporate officers of a party *must always* be deposed at their place of business. Thus, [**5] Cooper did not present any factual evidence to the Magistrate. Nor can it do so now.

Based on the facts before her, the Magistrate concluded that justice would not be disserved by deposing the two Cooper officers in Chicago. We agree. In this case, plaintiff Kasper is suing to vindicate his dead father's patent. Kasper does not have the resources of a corporation to back him in this endeavor and has only obtained counsel to pursue this matter on a contingency fee basis. Additionally, if the deposition takes place in Canada, Cooper will most likely have to pay the expenses of its Chicago counsel to be present. So, whether its two officers fly to Chicago or it two lawyers fly to Canada, the expenses to Cooper will be approximately the same, if not less with the depositions in Chicago. Finally, Cooper contends that all of the documents requested are in Canada. However, it does not indicate that production of the documents in Chicago will entail any extraordinary expense. Accordingly, we find that the Magistrate's decision that justice will be served by having the depositions in Chicago was not contrary to law. It is so ordered.